# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
### Assigned on Briefs January 27, 2004

## STATE OF TENNESSEE v. MICHAEL W. GIBSON

**Direct Appeal from the Criminal Court for Anderson County**
**No. A2CR0108     James B. Scott, Jr., Judge**

---

**No. E2003-01381-CCA-R3-CD**
**April 2, 2004**

---

The defendant was convicted of assault, a Class A misdemeanor, for punching a police officer and was sentenced to eleven months, twenty-nine days, with sixty days to serve before applying for probation.  He raises seven issues on appeal: (1) whether the trial court erred in admitting a tape recording of the officer's call to dispatch; (2) whether the trial court erred in failing to instruct the jury to disregard the dispatcher's testimony; (3) whether the trial court erred in denying the defendant's motion for a mistrial based on the officer's testimony about her recognition of the defendant; (4) whether the trial court erred in denying the defendant's request to publish a second officer's supplemental report to the jury; (5) whether the trial court erred in allowing defense witnesses to be impeached with evidence of other crimes; (6) whether trial counsel provided ineffective assistance by withdrawing his request to cross-examine police officers regarding prior complaints against them of excessive force; and (7) whether the evidence was sufficient to sustain the defendant's conviction.  We find no reversible error in the trial court's evidentiary rulings and conclude that the defendant failed to meet his burden of demonstrating ineffective assistance of counsel.  We further conclude there was ample evidence to sustain the defendant's conviction for assault.  Accordingly, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the court, in which GARY R. WADE, P.J., and ROBERT W. WEDEMEYER, J., joined.

Charles D. Buckholts (on appeal) and Michael Ritter (at trial), Oak Ridge, Tennessee, for the appellant, Michael W. Gibson.

Paul G. Summers, Attorney General and Reporter; Helena Walton Yarbrough, Assistant Attorney General; James N. Ramsey, District Attorney General; and Janice G. Hicks, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

## FACTS

On March 13, 2001, the defendant, Michael W. Gibson, was arrested for assault for striking Oak Ridge Police Officer Karen Wehenkel as she attempted to search him following her investigatory stop of his vehicle and as she and a fellow officer tried to place him under arrest. The defendant's first prosecution for assault ended in a mistrial when one of his defense witnesses asserted her Fifth Amendment right against self-incrimination. He was subsequently tried from September 4-5, 2002, on a charge of aggravated assault, which the trial court reduced to simple assault following the presentation of the evidence. After deliberating, the jury found the defendant guilty of assault, a Class A misdemeanor, and the trial court sentenced him to eleven months, twenty-nine days in the county jail, with the defendant to serve sixty days before applying for probation. On May 29, 2003, the defendant filed a delayed notice of appeal to this court, challenging the sufficiency of the evidence in support of his conviction, the effectiveness of counsel, and various evidentiary rulings by the trial court.[1]

## State's Proof

The State's first witness was orthopedic surgeon Dr. Michael Mackay, who testified he treated Officer Wehenkel from March 27, 2001, when she presented to his office with pain in her neck and shoulder, until July 9, 2002, when he referred her to a neurosurgeon. During the course of his treatment, he initially referred her for physical therapy and subsequently performed two surgeries, both of which were designed to relieve her pain. At the time he released her to return to work on July 9, 2002, he rated her with a six percent disability of the upper extremity.

Diane Davis, a dispatcher with the Oak Ridge Police Department, identified a tape recording of the 9-1-1 call she received on March 13, 2001, of shots fired at the Applewood Apartments and to which she dispatched Officer Karen Wehenkel and Officer Darrell Johnson as backup. She testified that, to her knowledge, nothing had been omitted from the four- to five-minute transmission contained on the tape recording, but she could not be sure because she did not create the tape. She said she communicated with the officers mainly by radio, but sometimes by telephone.

On cross-examination, Davis testified her supervisor excerpted the tape from a larger tape. She said she did not know if the larger tape was still in existence. She identified the "CAD" or "computer aided dispatch," report she created in connection with the shots fired call, on which she recorded that the original complaint was received at 10:32 p.m. from a woman named Alice Johnson at 205 Highland Avenue. Davis acknowledged the CAD report did not contain information about a cell phone call she received from Officer Wehenkel about a woman on the street having reported to her that she had seen a man beating a woman and shoving her into a yellow Cadillac. Davis said, however, that the information was on the tape recording, and explained on redirect that it was not

---

[1] The defendant was apparently granted leave to file a delayed appeal following his filing of a petition for post-conviction relief.

always possible for her to enter all the relevant information in the computer at the time she took the calls.

Officer Karen Wehenkel testified she had been in law enforcement for twelve years and an officer with the Oak Ridge Police Department for the past ten years. She said she first came in contact with the defendant in 1994. She testified she was dressed in uniform and patrolling alone in a marked unit on March 13, 2001, when she was dispatched between 10:30 and 11:00 p.m. to respond to a report of shots fired at the Applewood Apartments, located in the Hillside Road, Hunter Circle area. As she made her second lap around Hunter Circle, a "very animated," woman flagged her down and told her that she had just seen Charles Fulkerson beating a woman and shoving her into a yellow Cadillac. The woman said she had heard shots fired, but did not know if they were connected to the Cadillac incident.

Officer Wehenkel further testified that she informed dispatch on her cell phone of what the woman had reported as she drove toward the stop sign at Hunter Circle and Hillside Road. When she saw a yellow Cadillac turn the corner onto Hillside Road, she informed dispatch, turned her patrol car around, and followed the vehicle until it slowed down and moved from the street to a grassy, gravel area at the end of Hunter Circle. She activated her blue lights to let the driver know she wanted him to stop and recognized the defendant as the driver when he got out of the vehicle and started walking toward her patrol car. She informed dispatch who the driver was, threw her phone down on the seat without disconnecting, got out of her patrol car, and began walking toward the defendant. The defendant walked to the back of his vehicle and sat on the trunk with his hands on his knees. She told him about the shots fired report and of the woman who had been seen being beaten and shoved into a yellow Cadillac by Charles Fulkerson. She asked the defendant if he had been with Fulkerson, and he replied, "Yes." However, when she asked if Fulkerson had beaten a woman and thrown her into a yellow Cadillac, the defendant replied, "No."

Officer Wehenkel testified she determined she needed to investigate further and, for her safety, told the defendant that she needed to pat him down for weapons. However, the defendant told her, "No" and refused to comply when she ordered him to put his feet on the ground, turn around, and place his hands on the trunk. She reached to pull him off the trunk, and the defendant swung at her with a closed fist, striking her in the left side of the forehead. She pulled him around to face the back of his vehicle and again ordered him to place his hands on the trunk. This time he complied. However, he continued to argue and kept twisting his body around to face her, while at the same time keeping his hands on the trunk. He also initially refused to spread his legs. However, as she pushed on his feet with her shoe and repeatedly ordered him to spread his legs, he finally complied enough for her to do a partial patdown of his left side.

Officer Johnson arrived as she was attempting her patdown and asked if the defendant was under arrest. She replied, "He is now." Officer Wehenkel explained she had decided to place the defendant under arrest when he first struck her, but waited to inform him until her backup arrived. She said when she told Officer Johnson the defendant was under arrest, the defendant turned completely around and said, "No." Officer Johnson ordered him to turn around and put his hands

behind his back, but he refused. At that point, Officer Johnson sprayed him in the face with pepper spray. The defendant reacted by kicking at Officer Johnson, and Officer Johnson fell to the ground. Officer Wehenkel grabbed the defendant and ordered him to put his hands behind his back, and he began punching her with his fist in the left side of her head, face, and neck, with one of the punches to her neck causing her left side to go numb and her arm to drop. Officer Johnson got up and tried to grab hold of the defendant, but fell back out of Officer Wehenkel's line of sight when the defendant kicked at him again. The defendant came back at her and she swung at him with her metal flashlight, aiming for his shoulder but hitting him in the head instead. The defendant looked at her with wide eyes, shook his head, and came at her again.

Officer Wehenkel testified that Officer Johnson returned with a long baton at about the same time that she saw some people come out of a duplex to her right. One of the bystanders yelled something to the defendant that she could not hear, and the defendant got on the ground. However, when Officer Johnson approached to place handcuffs on him, the defendant kicked at him again and tried to grab his baton. Officer Johnson retained control of the baton, and the defendant stood. At that point, the same man who had earlier yelled to the defendant called out to him again, telling him that he had better do what the officers told him and to get on the ground and let them handcuff him. Officer Wehenkel testified that the defendant listened to the man, got on the ground, and allowed himself to be handcuffed. She said she then turned and thanked the bystander for his assistance. She identified the dispatch tape and testified the tape accurately reflected what transpired during the incident.

On cross-examination, Officer Wehenkel testified the defendant's exact response when she told him she needed to pat him down was, "No, Wehenkel, no." She said she did not get the name of the man who assisted her at the scene. She testified her supervisor, Sergeant Nance, asked the assembled crowd if anyone had witnessed the incident, but only one person came forward to make a verbal statement. That individual, however, refused to make a written statement. At defense counsel's request, Officer Wehenkel read aloud from a letter she wrote to her captain, dated July 24, 2001, in which she stated that the Attorney General's Office had asked her for a list of possible witnesses to the incident and that it was her understanding Sergeant Nance had included the names, addresses, and statements from possible witnesses in a "Use of Force Incident Form." Officer Wehenkel explained she had been mistaken when she wrote the letter, and Sergeant Nance had later informed her he had been unable to locate any witnesses. She denied there was a "code of silence," or unwritten agreement among police officers not to testify against each other.

Officer Darrell Johnson testified he arrived to find the lights on Officer Wehenkel's patrol car flashing, Officer Wehenkel standing behind the defendant, and the defendant standing with his hands on the trunk of the vehicle. From their respective positions, it appeared to him that Officer Wehenkel was attempting to pat the defendant down for weapons. He asked if the defendant was under arrest, and she replied, "He is now." Officer Johnson said he informed the defendant he was under arrest and tried to grab his left wrist to bring it behind his back for handcuffing, but the defendant had his hands so tightly pressed on the vehicle he was unable to move them. Therefore, he delivered a one-second burst of pepper spray to the defendant's face.

Officer Johnson testified the pepper spray did not have any immobilizing effect on the defendant. Instead, he pulled his hands off the vehicle and swung at Officer Johnson's face with his closed right fist. He ducked the blow and stepped back, but the defendant grabbed him by the shirt collar, pulled him forward, and brought his right fist back to strike again. At that point, Officer Johnson's shirt ripped and he fell to the ground, where the defendant continued trying to strike him several more times with his hands and his feet. Officer Johnson testified he saw the defendant go after Officer Wehenkel while he was still on the ground attempting to get up and to remove his expandable baton from his belt. He said he was able to get to his feet but unable to physically remove his baton from his gear. He then went to his patrol car to retrieve his "PR 24" baton.

Officer Johnson testified that when he returned with the baton, the defendant was sitting on the ground and Officer Wehenkel was standing above him repeatedly ordering him to lie down, but the defendant was not complying. When he moved closer to assist, the defendant kicked at him with his left leg, and he delivered one blow with the baton to the defendant's left thigh. The defendant grabbed the baton and stood. As they struggled for control of the baton, the defendant kicked at his head three times with his right leg. Officer Johnson said he shoved the defendant when he felt the baton slip in his hands and realized the defendant was off-balance. The defendant fell to the ground and eventually complied with Officer Wehenkel's commands to lie down.

On cross-examination, Officer Johnson acknowledged his supplemental report stated that he witnessed the defendant attempt to hit and kick Officer Wehenkel. He testified he did not see the defendant make contact with Officer Wehenkel, but he did not see everything that occurred. He said he did not see Officer Wehenkel hit the defendant with her flashlight. He testified he had not heard of the expression "code of silence" until defense counsel mentioned it at the previous court proceeding.

Jim Lambert testified he was a police officer with the Oak Ridge Police Department on March 13, 2001, and one of the officers who responded to the incident. He said he secured the scene and asked if any of the bystanders had witnessed the incident, but all of them said they had not seen anything, and the crowd dispersed.

Sergeant Pete Nance, the shift supervisor and a former emergency medical technician, testified he responded after hearing the emergency tone on one of his officer's radios, indicating that the officer needed assistance. Four police cars and an ambulance were already on the scene when he arrived, and a crowd of thirty to forty bystanders was in the street. Sergeant Nance testified that the defendant was beside one of the patrol cars, and Officer Wehenkel was near her vehicle. He described Officer Wehenkel's appearance: "She was visibly shaken due to an altercation and her neck and face were reddened with slight abrasions such as like a scratch or something, scratches, and she had a cut on her ear and she had a, like a pump knot on her head, on her forehead." Sergeant Nance testified that he asked the assembled crowd if there were any witnesses, but no one came forward.

**Defense Proof**

Michael Weatherall, a registered nurse, testified the defendant was brought to the Methodist Medical Center on the evening of March 13, 2001, with a lacerated scalp and red, tearing eyes. He said the defendant told him he had been pepper sprayed and that his eyes were burning.

Robert Tyes, who said he had known the defendant for six or seven years, testified he was walking home from a friend's house at approximately 10:40 p.m. when he saw the defendant pull up in his vehicle, followed by Officer Wehenkel in her patrol car. The defendant got out of his vehicle and sat on the trunk, and Officer Wehenkel asked him something about a woman. Officer Wehenkel then began patting the defendant down, kicking on his feet and telling him to spread his legs. Ten or fifteen seconds later, a second police officer pulled up and asked Officer Wehenkel if the defendant was under arrest. She replied, "[N]o, but he is now." At that point, the second police officer sprayed the defendant with mace.

Tyes testified that the defendant, who was on his knees and appeared to be in pain, waved his arms in an effort to clear his eyes, but he never saw him throw any punches or attempt to resist Officer Wehenkel. According to his testimony, after the defendant was on the ground, Officer Wehenkel swung at him once, and the second police officer swung at him twice with a stick or a flashlight he retrieved from his patrol car. Tyes said the defendant grabbed the object from the officer after his second swing, threw it over a fence, and then went back down on the ground. He said he heard the defendant scream at the officers after being sprayed with mace, "Why are you doing this to me[?]"

On cross-examination, Tyes acknowledged he had been convicted of theft of property on January 7, 1997, denied having a grudge against the Oak Ridge Police Department based on a January 2000 conviction for resisting arrest, and testified he did not owe the bonding company owned by the defendant's relative any money on the $4500 bond it had paid on his behalf.

Desmond Shonte Freeman testified he was twenty years old and had known the defendant since he was a child. He said he was staying at a friend's house when he saw the lights from a police car. After he went outside, he heard Officer Wehenkel ask the defendant if he had a gun and the defendant reply no. Seconds later, a second police officer arrived and asked if the defendant was under arrest. Officer Wehenkel replied, "He is now," and the second police officer sprayed the defendant with mace. The defendant, who had one hand handcuffed, started swinging his arms wildly because his eyes were burning. The second officer ran to his car and retrieved his stick, while Officer Wehenkel hit the defendant over the head with a flashlight. Next, the second officer started hitting the defendant with his stick, but the defendant caught it and threw it by a fence. At that point, a woman named Reba came outside her home and yelled at the officers to stop hitting the defendant because he was already on the ground. Freeman testified he did not see the defendant throw any punches. On cross-examination, he acknowledged he had been convicted for theft in juvenile court in April 1996.

The defendant testified he was thirty-five years old, married, and the father of five children. At the time of the incident, he lived on Hunter Place. He was returning home in his 1979 Cadillac Coupe DeVille after buying milk at the grocery on the evening of March 13, 2001, when he saw a police car at the stop sign on East Hunter Circle. He continued home and pulled into his driveway and then noticed the blue lights on the police vehicle behind him. He got out of his car and sat on his trunk as Officer Wehenkel got out of her patrol car and approached him yelling his name. She asked him what he had been doing and he told her nothing. She then asked if he had a gun and told him there had been a report of a woman having been dragged into his car.

The defendant testified Officer Wehenkel told him to get off the trunk, turn around, and place his hands on the vehicle, and he complied. He said she was kicking at his legs and telling him to spread them, when he heard a voice ask if he was under arrest and Officer Wehenkel reply, "He is now." He looked up, saw Officer Johnson, and was immediately sprayed with mace, which felt like a "big snowball" hitting him in the face. He described what next ensued:

> [A]nd I fell to the right and I felt the thunk on my head and she was yelling: Get down! Get down! Michael, get down! I was down, and the next thing I know, you know, I was blind, couldn't see nothing, didn't know what was going on, and feeling beaten and beaten and then I heard my son screaming and yelling and I was wondering why, what's going on, and next thing; I was on my knees and I had been handcuffed and as I could open my eyes for a period of two and a half seconds, maybe three, I could see, just barely see, you know, it's like blinking, if you blink your eyes real fast is what you see, and I observed the stick coming down; I caught the stick, I come up with the stick, got the stick out, tossed the stick, and I fell back down. And I heard her yelling at me: Get down! Get down, Michael! I'll shoot you. And there were kicks to my lower rectum and between the crotch of my legs and, you know, I'm like what's going on? Why are you all doing this to me? I haven't done anything.

The defendant denied having refused Officer Wehenkel's command to get off the trunk of the car. He testified he did not throw a punch at anyone, and Officer Wehenkel's testimony that he punched her was a lie. He said Charles Fulkerson was his uncle, but he had not seen him for about a month prior to this incident, and Officer Wehenkel lied when she testified he told her he had been with Fulkerson that evening. On cross-examination, he said he told Officer Wehenkel he did not know where Fulkerson was and had not seen him in a month and a half. He said he did not rip Officer Johnson's collar or strike either officer and claimed that both officers lied about the incident.

At the conclusion of the evidence, the trial court granted the defendant's motion to reduce the aggravated assault charge to simple assault on the basis that the State had failed to overcome the presumption of prosecutorial vindictiveness raised by having indicted him with a greater offense

following the mistrial of the initial prosecution. After deliberating, the jury found the defendant guilty of assault. This appeal followed.

## ANALYSIS

### I. Admission of Tape Recording

The defendant first contends the trial court erred in admitting the tape recording of the dispatch call into evidence. He argues the tape was not properly authenticated because Diane Davis was not the custodian or preparer of the tape, and the State failed to call as a witness the individual who excerpted the tape from the longer original. The defendant asserts, therefore, that the tape constituted inadmissible hearsay which violated his Sixth Amendment right to confrontation. The State argues the tape was properly authenticated by both Davis and Officer Wehenkel and was admissible under the business records exception to the rule against hearsay.

The United States Constitution provides that a defendant has the right to be confronted with the witnesses against him. U.S. Const. amend. VI. The Supreme Court has held, however, that the confrontation clause is satisfied by evidence that falls "within a firmly rooted exception to the hearsay rule[.]" White v. Illinois, 502 U.S. 346, 356, 112 S. Ct. 736, 743, 116 L. Ed. 2d 848 (1992). Tennessee Rule of Evidence 803(6), the business records exception to the hearsay rule, provides as follows:

> Records of Regularly Conducted Activity. – A memorandum, report, record, or data compilation, in any form, of acts, events, conditions, opinions, or diagnoses made at or near the time by or from information transmitted by a person with knowledge and a business duty to record or transmit if kept in the course of a regularly conducted business activity and if it was the regular practice of that business activity to make the memorandum, report, record or data compilation, all as shown by the testimony of the custodian or other qualified witness or by certification that complies with Rule 902(11) or a statute permitting certification, unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness. The term "business" as used in this paragraph includes business, institution, profession, occupation, and calling of every kind, whether or not conducted for profit.

Under Tennessee Rule of Evidence 1003, "[a] duplicate is admissible to the same extent as an original unless a genuine question is raised as to the authenticity of the original."

The defendant argues that the tape was improperly admitted and therefore violated the confrontation clause, because the custodian or preparer of the tape did not testify as to its authenticity. However, Rule 803(6) provides for testimony by either the "custodian or other

-8-

qualified witness." Diane Davis, the police dispatcher who handled the call, identified her initials and the date written on the outside of the cassette tape, as well as her voice and the voices of the police officers involved in the incident. She testified that the tape contained exactly what she and the officers said at the time and, to her knowledge, did not omit anything, but she could not be positive because she did not create the excerpt. Officer Wehenkel also identified the tape by her initials and date and the voices contained on the recording. Moreover, unlike Davis, she unequivocally testified that the tape accurately reflected what was said during the incident. Although the defendant argues to the contrary, there was no genuine issue raised regarding the trustworthiness of the manner in which the excerpt was created. We conclude, therefore, that the tape was properly authenticated and admissible under the business records exception to the rule against hearsay.

## II. Failure to Instruct Jury to Disregard Davis's Testimony

The defendant next contends that the trial court erred by failing to instruct the jury to disregard Davis' testimony about matters of which she had no personal knowledge. Specifically, the defendant complains about Davis' inability to adequately explain when the original shots fired call complaint had been changed to an assault call on the computer-generated CAD report. During redirect examination, the following exchange occurred:

> Q    Tell me what these three reports are that are next to your name D. Davis.
>
> A    I'm not positive; the computer generates it. I'm not sure. It may be when we change the call complaint.
>
> [DEFENSE COUNSEL]: Your Honor, I object to what may be.
>
> THE COURT: Well, the Court would let it go to the weight of the evidence. She said she is not sure what those are; it may be, but that just goes to the weight of the evidence.
>
> BY [PROSECUTOR]:
>
> . . . .
>
> Q    23:42:36 shots fired. What call does that relate to that you see on any other part of that report?
>
> A    It's about the time that the other person called in, but I'm not sure. That's computer generated and I don't know.

Q       And the computer also puts your name by it?

A       Oh, yeah.

Q       Because you're the person taking these.  22:42:43 assault.

A       I know the call was a shots-fired call and that's what the original complaint was, and the dispatcher has to change the code for the complaint and it was changed to assault so I think that's when I changed it.

Q       Did you change it in response to anything about a woman in a Cadillac?

A       No, ma'am.

        [DEFENSE COUNSEL]: Your Honor,  I'm going to object to this testimony.  She's already answered that she's not sure about it and she's answering things in violation of Tennessee Rules of Evidence based on the personal observation and knowledge and her testimony is that she doesn't know.  And now, [the prosecutor] is leading her into something that she's already said that she didn't know.

        THE COURT: I'll sustain leading, General.  This witness can only testify as to what she knows under the Rules of Evidence.

BY [PROSECUTOR]:

Q       You put in, you changed it from a shots-fired call to an assault call?  Is that what you're saying?

A       Yes, ma'am.

Q       And at this date do you remember why you changed something from a shots-fired to an assault?

A       There may be [sic] a supervisor or something told me to or I don't remember.  It's been a while.

The defendant argues that "[t]he judge should have instructed the jury to disregard all of [Davis'] testimony since she could only answer that the information was computer generated information and could not remember if the shots-fired call was changed to an assault until after the attorney general questioned her by leading her testimony on direct examination." The State responds by arguing that the defendant has waived the issue by failing to request a curative instruction from the trial court, and further, that any alleged error is harmless. We agree with the State.

"If a party fails to request a curative instruction, or, if dissatisfied with the instruction given and does not request a more complete instruction, the party effectively waives the issue for appellate purposes." State v. Griffis, 964 S.W.2d 577, 599 (Tenn. Crim. App. 1997) (footnote omitted); see also Tenn. R. App. P. 36(a). Since the defendant failed to request that the trial court instruct the jury to disregard Davis' testimony, this issue is waived. However, even if not waived, the defendant would not be entitled to any relief, as he has failed to show how he was prejudiced by the admission of the testimony. As the trial court noted, Davis' inability to fully explain the computer-generated reports, which included the circumstances under which the characterization of the call was changed from shots fired to assault, went to the weight of her testimony rather than to its admissibility. We conclude, therefore, that the trial court did not err by failing to instruct the jury to disregard this witness's testimony.

### III. Failure to Declare a Mistrial

As his third issue, the defendant contends the trial court should have declared a mistrial following Officer Wehenkel's testimony about her prior contact with the defendant. After Officer Wehenkel testified that she first came in contact with the defendant in 1994, defense counsel objected and moved for a mistrial, arguing that such testimony constituted evidence of prior bad acts, in violation of Tennessee Rule of Evidence 404(b). Although the trial court denied the defendant's motion for a mistrial, it issued the following curative instruction to the jury:

> Before the jury-out hearing there was a question involving knowledge of the officer as it relates to [the defendant]. You cannot draw an inference of anything other than the question of identity. Do you understand what I am saying? With that in mind, we will proceed.

Whether or not to declare a mistrial lies within the sound discretion of the trial court, and we will not disturb the court's decision absent a clear showing of abuse of discretion. State v. Land, 34 S.W.3d 516, 527 (Tenn. Crim. App. 2000) (citations omitted). A mistrial should be declared in a criminal case only when something has occurred that would prevent an impartial verdict, thereby resulting in a miscarriage of justice if a mistrial is not declared. See id. (citing State v. McPherson, 882 S.W.2d 365, 370 (Tenn. Crim. App. 1994)); State v. Jones, 15 S.W.3d 880, 893 (Tenn. Crim. App. 1999) (citing Arnold v. State, 563 S.W.2d 792, 794 (Tenn. Crim. App. 1977)). "Generally a mistrial will be declared in a criminal case only when there is a 'manifest necessity' requiring such action by the trial judge." State v. Millbrooks, 819 S.W.2d 441, 443 (Tenn. Crim. App. 1991)

(quoting <u>Arnold</u>, 563 S.W.2d at 794). The burden to show the necessity for a mistrial falls upon the party seeking the mistrial. <u>Land</u>, 34 S.W.3d at 527 (citing <u>State v. Williams</u>, 929 S.W.2d 385, 388 (Tenn. Crim. App. 1996)).

We agree with the State that the defendant failed to show how Officer Wehenkel's testimony about her prior contact with the defendant created a manifest necessity for a mistrial. Officer Wehenkel's testimony that she first came into contact with the defendant in 1994 did not reveal the circumstances of the contact. Moreover, the trial court specifically instructed the jury not to draw any inferences from the statement other than Officer Wehenkel's identification of the defendant. Jurors may be presumed to follow the instructions issued by the trial court. <u>See</u> <u>Millbrooks</u>, 819 S.W.2d at 443; <u>State v. Blackmon</u>, 701 S.W.2d 228, 233 (Tenn. Crim. App. 1985). Under these circumstances, there was no need for a mistrial to be declared. Accordingly, we conclude that the trial court did not abuse its discretion in denying the defendant's request for a mistrial.

### IV. Failure to Admit Officer Johnson's Supplemental Report

The defendant next contends that the trial court erred by failing to admit Officer Johnson's supplemental report into evidence. The trial court allowed the defendant to cross-examine Officer Johnson about the contents of the report, but refused the defendant's request that the report be admitted as an exhibit and published to the jury, on the basis that it was inadmissible hearsay. The defendant now argues the report was not hearsay because it was not offered in support of the truth of the matter asserted, but rather to show inconsistencies between the officers' accounts of the incident and the information contained in the report. He further argues that, even if hearsay, the report fell within the recorded recollection, business records, and public reports exceptions to the hearsay rule.

As an initial matter, we respectfully disagree with the defendant's assertion that the report was not hearsay. "Hearsay" is defined as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Tenn. R. Evid. 801(c). Notwithstanding the defendant's claim to the contrary, he sought to offer Officer Johnson's statements in the supplemental report to prove the truth of the matter asserted, *i.e.*, that the defendant merely attempted to strike Officer Wehenkel without making contact with her body.

We further disagree that the report fell within any of the exceptions to the rule against hearsay. Tennessee Rule of Evidence 803(5), "Recorded Recollection," provides as follows:

> A memorandum or record concerning a matter about which a witness once had knowledge but now has insufficient recollection to enable the witness to testify fully and accurately, shown to have been made or adopted by the witness when the matter was fresh in the witness's memory and to reflect that knowledge correctly. If admitted, the memorandum or record may be read into evidence but

may not itself be received as an exhibit unless offered by an adverse party.

There was nothing to suggest that Officer Johnson's recollection was diminished, as he provided a full and detailed account of the incident on direct examination before defense counsel began cross-examining him about the information contained in his supplemental report. Thus, the report was not admissible under the recorded recollection exception to the rule against hearsay. We further note at this junction that, contrary to the defendant's claim, Officer Johnson's testimony on direct examination, in which he stated that he saw the defendant go after Officer Wehenkel but did not witness what occurred between them because he was concentrating on removing his expandable baton from his belt, did not contradict the statements contained in his supplemental report.

We also conclude that the trial court did not err in failing to admit the report under the business records or public records exceptions to the rule against hearsay. Police reports are generally inadmissible as evidence, and the public records exception to the hearsay rule specifically excludes their introduction. See Tenn. R. Evid. 803(8). At trial, the defendant did not argue that the report was admissible under the business records exception. See Tenn. R. Evid. 803(6). Thus, he has waived this issue for appellate review. However, even if not waived, the defendant has failed to show on appeal how the report falls outside the general rule of exclusion. See State v. Thompson, 36 S.W.3d 102, 109 (Tenn. Crim. App. 2000). Furthermore, even if the general rationale for the exclusion of police reports as hearsay is not present in this case, in that the report contained information based on Officer Johnson's personal observation and experience with the defendant, see State v. Aaron A. Winters and Derwin V. Thomas, No. 02C01-9802-CR-00053, 1999 WL 628968, at *9 (Tenn. Crim. App. Aug. 19, 1999), perm. to appeal denied (Tenn. Mar. 6, 2000) (stating that "primary problem with the admissibility of police reports is that the report is hearsay made up of opinion or conclusion not based on personal knowledge"), the defendant has not shown how the exclusion of such evidence prejudiced the outcome of his trial. Tenn. R. App. P. 36(b). We conclude, therefore, that this issue is without merit.

### V. Admissibility of Defense Witnesses' Prior Convictions

The defendant next contends the trial court committed reversible error by allowing the State to introduce evidence of his defense witnesses' prior convictions. He argues the probative value of Tyes's conviction for resisting arrest was substantially outweighed by the danger of unfair prejudice, confusion of the issues and misleading of the jury, under Tennessee Rule of Evidence 403, because the crime was so similar to the crime for which the defendant was on trial. He further argues that Freeman's juvenile conviction for theft should not have been admitted because it was not necessary for a determination of the guilt or innocence of the defendant and violated the public policy of the State to protect juvenile records.

Tennessee Rule of Evidence 616 provides that "[a] party may offer evidence by cross-examination, extrinsic evidence, or both, that a witness is biased in favor of or prejudiced against

a party or another witness." As explained in Neil P. Cohen et al., Tennessee Law of Evidence, § 6.16[3][d] (4th ed. 2000):

> Sometimes evidence may be admissible to prove bias or prejudice but would be inadmissible for other purposes. For example, Rule 411 bars proof of insurance coverage, but a defense witness who is employed by the insurance company defending the case may be asked his or her employment. Similarly, extrinsic evidence of specific acts may be admissible on bias though not permitted under Rule 608 to attack general credibility for untruthfulness. A limiting instruction may be appropriate in such cases.

In this case, the State attempted to show that Tyes was biased toward the defendant and prejudiced against the police department based on his prior experience with the police. "The feelings that a witness has with regard to a party or issue are an important factor for the trier of fact to consider in assessing the weight to be given to the witness' testimony." State v. Williams, 827 S.W.2d 804, 808 (Tenn. Crim. App. 1991). We note that, after the State's initial question on the topic, the trial court immediately instructed the jury that "this may be inquired into only for the purpose of showing any bias" and that the jury should consider it "for that reason only." Thereafter, the trial court stopped the State's attempt to elicit details about the incident with the following instruction to the jury:

> General, I will sustain the objection as it relates to that. Now, disregard the question. We are not going into that. You have asked about whether or not this person had any bias and he has answered that question. Members of the Jury, you will not consider that and entertaining any proof here. Proceed.

We conclude that the trial court did not err in allowing the State its limited cross-examination of Tyes about his conviction for resisting arrest.

The defendant also argues that the trial court erred in allowing the State to cross-examine Freeman about his juvenile theft conviction. A trial court's decision to allow a witness to be impeached with a prior conviction will not be overturned absent an abuse of discretion. See State v. Sheffield, 676 S.W.2d 542, 549 (Tenn. 1984). We find no abuse of discretion in this case. Tennessee Rule of Evidence 609(d) generally prohibits the use of a juvenile conviction to impeach a witness's testimony. However, where the witness is someone other than the accused, evidence of the conviction may be admitted if: (1) the conviction would be admissible to attack the credibility of an adult and (2) the court determines that the evidence is necessary for a fair determination in the proceeding. Tenn. R. Evid. 609(d); see also State v. Butler, 626 S.W.2d 6, 10-11 (Tenn. 1981); State v. Bowers, 762 S.W.2d 889, 891 (Tenn. Crim. App. 1988). The trial court held a bench conference out of the hearing of the jury to consider the issue, before ruling that the State would be allowed to impeach Freeman's credibility with the juvenile conviction. Immediately following Freeman's

affirmative response to the State's question of whether he was the same Freeman who had been convicted of theft in juvenile court, the trial court issued a curative instruction to the jury that the information was to be used only for testing the credibility of the witness. The trial court handled the matter appropriately. We conclude, therefore, that this issue is without merit.

## VI. Ineffective Assistance of Counsel

As his next issue, the defendant contends trial counsel provided ineffective assistance by withdrawing his request to cross-examine Jim Lambert about an alleged misconduct citation and Officer Wehenkel about an alleged complaint filed against her for using excessive force. The defendant makes only a cursory argument on this issue, stating that "the credibility of the witnesses were crucial for the jury," he "had a right to confront the witnesses regarding any prior complaints of excessive force," and "[b]y withdrawing this request, [his] counsel provided him with ineffective assistance of counsel."

To succeed on a claim of ineffective assistance of counsel, the defendant must show by clear and convincing evidence both that counsel's performance was deficient and that counsel's deficient performance prejudiced the outcome of his trial. Tenn. Code Ann. § 40-30-210(f) (1997); Strickland v. Washington, 466 U.S. 668, 687, 104 S. Ct. 2052, 2064, 80 L. Ed. 2d 674 (1984). The Strickland standard is a two-prong test:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

466 U.S. at 687, 104 S. Ct. at 2064.

The deficient performance prong of the test is satisfied by showing that "counsel's acts or omissions were so serious as to fall below an objective standard of reasonableness under prevailing professional norms." Goad v. State, 938 S.W.2d 363, 369 (Tenn. 1996) (citing Strickland, 466 U.S. at 688, 104 S. Ct. at 2065; Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn.1975)). When reviewing an ineffective assistance of counsel claim, this court must indulge a strong presumption that the conduct of counsel fell within the range of reasonable professional assistance, see Strickland, 466 U.S. at 690, 104 S. Ct. at 2066, and may not second-guess the tactical and strategic choices made by trial counsel unless those choices were uninformed because of inadequate preparation. See Hellard v. State, 629 S.W.2d 4, 9 (Tenn. 1982). The prejudice prong of the test is satisfied by showing a reasonable probability, *i.e.*, a "probability sufficient to undermine confidence in the outcome," that "but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694, 104 S. Ct. at 2068. Because both prongs of the test must be satisfied,

-15-

a failure to show either deficient performance or resulting prejudice results in a failure to establish the claim.  See Henley v. State, 960 S.W.2d 572, 580 (Tenn. 1997).

This court has noted "that the practice of raising ineffective assistance of counsel claims on direct appeal is 'fraught with peril' since it 'is virtually impossible to demonstrate prejudice as required' without an evidentiary hearing."  State v. Blackmon, 78 S.W.3d 322, 328 (Tenn. Crim. App. 2001) (quoting Kirby George Wallace v. State, No. 01C01-9308-CC-00275, 1994 WL 504401 (Tenn. Crim. App. Sept. 15, 1994)).  Assuming, *arguendo*, that trial counsel was deficient for withdrawing his request to cross-examine the officers about the alleged misconduct, the defendant still has not shown by clear and convincing evidence that such deficiency prejudiced the outcome of his trial.  Accordingly, we conclude he has failed to meet his burden of demonstrating ineffective assistance of counsel.

## VII.  Sufficiency of the Evidence

As his final issue, the defendant contends that the evidence was insufficient to support his conviction.  He argues that the State's witnesses, particularly Officers Wehenkel and Johnson, were not as credible as his witnesses, who provided consistent accounts of the incident.  The State argues that the credibility of the witnesses was for the jury to determine and that the evidence overwhelmingly supported the jury's verdict.  We agree with the State.

When the sufficiency of the convicting evidence is challenged on appeal, we must consider "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789, 61 L. Ed. 2d 560, 573 (1979); see also Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."); State v. Evans, 838 S.W.2d 185, 190-92 (Tenn. 1992); State v. Anderson, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992).

All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact.  See State v. Pappas, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987).  "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State."  State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973).  Our supreme court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation.  The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand.  Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses.  In the trial

> forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

Bolin v. State, 219 Tenn. 4, 11, 405 S.W.2d 768, 771 (1966) (citing Carroll v. State, 212 Tenn. 464, 370 S.W.2d 523 (1963)). A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal, a convicted defendant has the burden of demonstrating that the evidence is insufficient. See State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

The defendant was charged with assault for intentionally, knowingly, or recklessly causing bodily injury to Officer Wehenkel. See Tenn. Ann. Code § 39-13-101(a)(1). Viewed in the light most favorable to the State, the evidence established that the defendant struck Officer Wehenkel on the side of the head with his closed fist as she attempted to pat him down for weapons and struck her repeatedly with his closed fist in the face, head, and neck as she and Officer Johnson attempted to place him under arrest. The evidence further established that she suffered bodily injury, in the form of a knot to her forehead, scratches to her face, a cut on her ear, and damage to her neck and shoulder that required two surgeries. The defendant argues that the State's evidence was inconsistent because Officer Johnson did not witness him make contact with Officer Wehenkel's body. However, from the testimony of both officers, it was clear that Officer Johnson was not in a position to view everything that occurred between the defendant and Officer Wehenkel. By finding the defendant guilty of assault, the jury obviously chose to accredit the witnesses for the State over the witnesses for the defense. This was its prerogative as the trier of fact, and we will not disturb its findings. We conclude, therefore, that the evidence was sufficient to sustain the defendant's conviction.

## CONCLUSION

Based on the foregoing authorities and reasoning, we affirm the judgment of the trial court.

ALAN E. GLENN, JUDGE