# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
October 19, 2010 Session

## FRED THOMPSON, JR. v. STATE OF TENNESSEE

**Appeal from the Criminal Court for Davidson County**
**No. 2001-B-1192      Steve Dozier, Judge**

---

**No. M2009-02457-CCA-R3-PC - Filed March 31, 2011**

---

The Petitioner, Fred Thompson, Jr., appeals as of right from the Davidson County Criminal Court's denial of his petition for post-conviction relief. The Petitioner was convicted of first degree murder committed in the perpetration of theft and theft of property valued less than $10,000, a Class D felony. He received a sentence of life imprisonment for the first degree murder conviction and a concurrent sentence of five years for the theft conviction. The Petitioner challenges the performance of trial and appellate counsel. Following our review, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court is Affirmed.**

D. KELLY THOMAS, JR., J., delivered the opinion of the court, in which ROBERT W. WEDEMEYER and THOMAS T. WOODALL, JJ., joined.

Jeremy W. Parham, Nashville, Tennessee, for the appellant, Fred Thompson, Jr.

Robert E. Cooper, Jr., Attorney General and Reporter; Lacy Wilber, Assistant Attorney General; Victor S. Johnson, III, District Attorney General; and Rachel Marie Sobrero, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

On direct appeal, the Petitioner challenged the sufficiency of the convicting evidence, the trial court's denial of his motion for judgment of acquittal, and the trial court's failure to perform its role as thirteenth juror; this court affirmed the Petitioner's convictions. State v. Fred Eugene Thompson, Jr., No. M2006-00292-CCA-R3-CD, 2007 WL 2437948 (Tenn. Crim. App. Aug. 24, 2007), perm. app. denied (Tenn. Dec. 17, 2007). Although the facts of

the Petitioner's case have already been discussed in this court's opinion affirming the Petitioner's convictions on direct appeal, we will provide the following factual summary to establish context for the Petitioner's issues before this court. See id.

This case arose from the Petitioner's involvement in the murder of William Burton Craig. The victim died from a severe beating that was believed to be inflicted with the aid of a can of Vietti Chili and a can of Sweet Sue Chicken and Dumplings. An examination of the victim's home revealed that Augustine Lopez's fingerprint was on the can of Sweet Sue Chicken and Dumplings, while the Petitioner's fingerprints were on the bathroom door and the telephone handset in the den. When the Petitioner was arrested, a mixture of blood was found on his boots – the Petitioner and the victim could not be excluded as the contributors. The Petitioner's own blood was also found on the Petitioner's pants.

At trial, the Petitioner testified that he was riding in a car with an unidentified person when they picked up Jeffrey Fuqua and Mr. Lopez. The Petitioner did not know Mr. Lopez. The four traveled to the victim's house, where Mr. Lopez went inside and asked to purchase some marijuana. Mr. Lopez was told to come back later. On their return trip at approximately 8:00 p.m., Mr. Lopez went inside the house and was gone for approximately 30 minutes before coming out the front door. The Petitioner asked to use the bathroom, and Mr. Lopez allowed him to come inside.

While the Petitioner was in the bathroom, he heard the victim and Mr. Lopez arguing. The Petitioner came out of the bathroom and saw the victim and Mr. Lopez fighting in the kitchen. Mr. Lopez was hitting the victim with a can, saying that the victim owed him. Mr. Lopez continued to beat the victim, while the Petitioner attempted to leave. The unidentified man and Jeffrey Fuqua had driven away; therefore, the Petitioner attempted to use the telephone in the den to call someone to pick him up. As he was picking up the headset, Mr. Lopez told him to put the phone down and offered him a ride in the victim's car, a white four-door car. The Petitioner got into the passenger's seat and told Mr. Lopez to take him to the Four Aces Bar.

Sharon Vickers, a bartender at the Four Aces Bar, testified that the Petitioner came into the bar before her shift ended at 5:00 p.m. on November 29, 2000. While at the bar, the Petitioner attempted to sell some clothes, a television, and a VCR. She also saw Stella Mai Mitchell, who was supposed to be working in the bar, inside what was believed to be the Petitioner's car, a white four-door car.

Jan Crow Beech testified at trial that she had lived with the victim when she was separated from her estranged husband, Clayton Veach. Mr. Veach was unhappy with this arrangement and had threatened Ms. Beech and the victim on a number of occasions. She

stated that she was with Mr. Veach the night that the victim was murdered. She also testified that she met Mr. Lopez on November 22, 2000, seven days before the murder, and that she had sexual intercourse with him in the victim's car after she attempted to purchase cocaine from him. She stated that she owed Mr. Lopez money, and that Mr. Lopez, his girlfriend, the victim, and Ms. Beech slept at the victim's house on November 22, 2000.

After his convictions were affirmed on appeal, the Petitioner filed a timely petition for post-conviction relief on July 14, 2008, in which he alleged that trial and appellate counsel were ineffective. The post-conviction court appointed counsel, who filed an amended petition on April 20, 2009.

At the post-conviction hearing, the Petitioner testified that trial counsel failed to effectively cross-examine Ms. Vickers at trial. The Petitioner testified that Ms. Vickers, in a police report, stated that she saw the Petitioner and Ms. Mitchell at the Fork and Cork Bar on Gallatin Road in a maroon car. This statement conflicted with her testimony at trial. The Petitioner testified that trial counsel should have pointed out the differences in the witness's testimony and introduced the police report to rebut Ms. Vickers's testimony at trial. The Petitioner also stated that trial counsel should have elicited testimony at trial from the police officers who took the report.

Also relative to Ms. Vickers, the Petitioner testified that trial counsel should have asked Vallean Haire, the owner of the Four Aces Bar, about Ms. Vickers's bias against the Petitioner. According to the Petitioner, Ms. Vickers was upset with him because he told Ms. Haire that she was "dancing on the table with her top off and drinking" during her shift as a bartender. In addition, Ms. Mitchell was scheduled to work on November 29, 2000, and Ms. Vickers had to work for Ms. Mitchell, who was with the Petitioner. The Petitioner stated that he informed trial counsel of the witness's bias but that trial counsel failed to effectively elicit the relevant testimony.

The Petitioner testified that trial counsel met with him three times and that in total, she only spent 45 minutes with him. Trial counsel never discussed trial strategy with him, advised him regarding the elements of the crime, or communicated any plea offers from the State. Trial counsel failed to produce Jeffrey Fuqua as a witness at trial even though the Petitioner believed that this witness could corroborate his story. Trial counsel never told the Petitioner that she was going to admit in her opening statement that the Petitioner was at the victim's house on the night of the murder. The Petitioner testified that as a result of counsel's opening statement, he had to testify. He admitted that his fingerprints were at the victim's residence but asserted that the State did not have any evidence that placed him at the victim's house on the night of the murder.

The Petitioner testified that trial counsel misstated the evidence presented at trial during closing argument when she said that he had the victim's blood on his right boot. He said that the evidence presented at trial reflected that he had a mixture of blood on his right boot and that he and the victim could not be excluded as the contributors of the blood. The State and counsel for the co-defendant also misstated the evidence in their closing arguments, but trial counsel did not object to their misstatements.

The Petitioner testified that trial counsel was ineffective for failing to properly introduce prior inconsistent statements from Ms. Beech. According to Mr. Veach, Ms. Beech told him that the victim was killed with a can of chili. Ms. Beech further stated that the victim was not supposed to die. The trial court ultimately ruled that the evidence was inadmissible because trial counsel failed to confront Ms. Beech with the statements during cross-examination.

The Petitioner stated that appellate counsel failed to raise several important issues on appeal. The Petitioner stated that some of the jury members were crying when they returned with the verdict and that trial counsel was not allowed to poll the jury. He testified that one of the jury members may have been pressured to make a decision because she had to leave for a business trip. Trial counsel attempted to contact the jurors after the trial to ask them about these issues, and two jurors responded to her inquiry. However, trial counsel failed to bring these jurors to the motion for new trial hearing. The Petitioner testified that trial counsel also failed to show him the letters that she had received from the jurors. The Petitioner stated that he told appellate counsel about these issues, but appellate counsel told him that these issues would be more appropriate for a post-conviction case.

On cross-examination, the Petitioner admitted that trial counsel questioned Ms. Vickers about her previous inconsistent statement to police and that Ms. Haire was a witness at trial. When pressured on how long he actually spent with trial counsel, the Petitioner stated that he "probably" spent an hour with trial counsel. He said that he called trial counsel's office and left "numerous messages" for her. When asked about the blood on his boot, the Petitioner stated that it was his blood on the boot. He said that he was in the hospital four times because he suffered from esophageal varices.

Trial counsel testified that although Ms. Vickers did not mention the Fork and Cork Bar at trial, she told the detective that the Petitioner was at the Four Aces Bar trying to sell the items and was then at the Fork and Cork Bar trying to sell the items. Trial counsel admitted that the witness had not mentioned that she saw the Petitioner attempting to sell clothing until trial and that the witness originally stated that the Petitioner was in a maroon car. Trial counsel stated that she cross-examined Ms. Vickers about these inconsistencies. Trial counsel admitted that she did not elicit testimony from the detectives regarding these

-4-

inconsistencies even though the witness did not remember the prior statements. She said that she did not want to recall a State's witness and risk "reiterat[ing]" the State's proof. Trial counsel stated that she called Ms. Mitchell as a defense witness to rebut Ms. Vickers's testimony regarding the white car. However, she did not think that asking Ms. Haire about Ms. Vickers's bias would assist the Petitioner. She stated that Ms. Vickers's bias was independent of her knowledge of the television and VCR because she did not know that the Petitioner had stolen them from the victim's home.

Trial counsel stated that she met with the Petitioner at length and discussed their strategy for trial and her opening statement. She said that they discussed whether he would testify at trial. She admitted the Petitioner had complained while they were preparing for trial that she was not visiting him, but she said she would not generally visit her clients unless there was a pressing need.

Trial counsel admitted that she told the jury that Jeffrey Fuqua would testify at trial and that he did not testify at trial. She explained that she personally investigated the case and searched for Jeffrey Fuqua herself, but she could not find him. She told the jury that Jeffrey Fuqua would testify because her investigator assured her that he would find the witness. She admitted that during her closing argument, she misstated the evidence relative to the blood on the Petitioner's boot. She did not believe that her misstatement affected the trial.

Trial counsel admitted that the jury appeared upset when they came back with a verdict and that she attempted to contact the jurors after trial. She said that she did not receive any letters from the jury, but two jurors called her. Juror Gray called and told her that it was a difficult decision and that "they got down to a reckless homicide" for the Petitioner. Juror Godchax called and told her that it was a "very difficult decision" but that he did not remember being rushed because one of the jurors had to leave for work. Juror Godchax told her that "what convinced him was that – that there was two, different types of blood on the boot." He also told her that he "couldn't make sense of the time frame that [the Petitioner] testified to and going to the front door and then picking up the phone and never calling." Trial counsel said she did not call the jurors as witnesses at the motion for new trial hearing because she "just didn't think there was anything that could be offered that would change anything."

Relative to Ms. Beech, trial counsel said that they were able to tell the jury, through Mr. Veach's testimony, that Ms. Beech had "a great deal of money" after she came back from visiting someone near where the victim lived on the night of the murder. She admitted that a statement from the witness that implicated her in the murder was deemed inadmissible because the trial court believed that she did not confront Ms. Beach with the statement. She

disagreed with the trial court's ruling because she believed that she asked the witness about the statement during cross-examination.

On cross-examination, trial counsel testified that she did not believe "there was some big animosity" between Ms. Vickers and the Petitioner. She said that Ms. Vickers may have been mad at the Petitioner, but she did not have a "huge axe to grind." Relative to the jury, trial counsel stated that she was able to poll the jury. She contacted the jurors because several of them were crying when the verdict was read. After speaking with Juror Godchax, she realized that a charge of accessory after the fact may have been appropriate in the Petitioner's case because the Petitioner opened the back gate when he left with Mr. Lopez. However, she did not believe that charging accessory after the fact would have made a big difference. Juror Godchax also told her that he believed the Petitioner was closer to the victim because of the blood on the Petitioner's boot.

Trial counsel testified that she met with the Petitioner more than three times before trial and that even if she was not meeting with the Petitioner face-to-face, she was still working on his case. She even gave the Petitioner her cellular telephone number "quite a while before trial." She remembered discussing the State's case with the Petitioner and advising him of the elements of the offense. She did not believe that the State offered the Petitioner any plea agreements and that even if they had offered anything, the Petitioner would have refused the deal because he "steadfastly maintained his innocence." She admitted that she had not been practicing law for a long time when she represented the Petitioner and that his case was her first murder case.

Appellate counsel testified that he was appointed by the trial court and that the Petitioner's appeal was his first criminal appeal, his first direct appeal of a trial, and his first involvement in a homicide case. When he was appointed, he asked the trial court if he could be assisted by "somebody that's been through these a few times." The trial court refused and told him that he would be "fine." He did not remember if he raised all of the issues that were included in the motion for new trial. He admitted that he did not raise the issue of Ms. Beach's prior inconsistent statement. When asked why he did not raise the trial court's ruling regarding Ms. Beach's statements as an issue on appeal, he said that he did not want to implicate Mr. Veech because Mr. Veech was not involved in the murder.

Detective James Fuqua testified at the post-conviction hearing that he was assigned to investigate the victim's homicide and that he questioned Ms. Vickers in his investigation. He said that he spoke with Ms. Vickers at the Four Aces Bar, where she told him that the Petitioner was known as "Fredro" and that she recalled seeing the Petitioner in a maroon car with a black hood several weeks ago. Ms. Vickers told him that the Petitioner was at the bar trying to sell a television and a VCR and that he was later seen at the Fork and Cork bar with

the same items. She told him that the owner of the Fork and Cork Bar "ran him out when he tried to sell them." Detective Fuqua could not remember if Ms. Vickers told him anything about the Petitioner trying to sell clothing at the bar.

Ms. Haire testified at the post-conviction hearing that the Petitioner used to come to her establishment, "Val's Place" and that Ms. Vickers was one of her employees. She was not aware of any conflict between Ms. Vickers and the Petitioner, but she said that she did not think that "the two should ever be together." She said that Ms. Vickers was "on crack cocaine" at the time and that she did not want the Petitioner "to be around her." She said that she "dismissed" Ms. Vickers because the Petitioner told her that Ms. Vickers had been removing her clothes and drinking while working. She said that her employees "always felt that [the Petitioner] was a narc" because "[h]e'd let [her] know what was going on in [her] place of business."

On cross-examination, Ms. Haire testified that Ms. Vickers applied for a job in 1987 or 1988. She said that the Petitioner told her "things" about her other employees and that he was somewhat of an "inside resource" that she had when she was not at her establishment. She said that after she fired Ms. Vickers for her behavior at work, Ms. Vickers sought counseling and eventually came back to work for her. She said that Ms. Vickers was working for her at the time of the Petitioner's trial. She said that Ms. Mitchell was fired "for the same reasons."

In a written order, filed on July 6, 2009, the post-conviction court denied the petition. The court found that the Petitioner "failed to prove by clear and convincing evidence any of his allegations and ha[d] not demonstrated any alleged prejudice." The post-conviction court specifically accredited trial counsel's testimony that she met with the Petitioner numerous times and discussed his case. The post-conviction court stated that trial counsel "adequately cross-examined each witness in the trial including asking [Ms.] Vickers about inconsistent statements regarding the car color and the clothing." Relative to closing argument, the post-conviction court found that the Petitioner failed to prove that trial counsel implicated him because the Petitioner "admitted to having a mixture of 'genetic material' on his boot." Relative to appellate counsel, the post-conviction court found that the Petitioner "has not proven his allegations by clear and convincing evidence."

## ANALYSIS

### I. Notice of Appeal

The State contends that the notice of appeal was untimely and that this court should dismiss the appeal. The record reflects that the order denying post-conviction relief was filed

on July 6, 2009; however, the Petitioner filed a notice of appeal on November 24, 2009 – more than three months after the judgment became final. In the notice of appeal, the Petitioner stated that post-conviction counsel did not inform him that the post-conviction court had denied his petition and that he had to contact the post-conviction court to obtain information regarding his case. The Petitioner stated that he filed the notice of appeal because he was concerned that post-conviction counsel had failed to file a notice of appeal. It appears as if the Petitioner's concerns were valid. The only notice of appeal contained in the appellate record was filed by the Petitioner. Counsel has never filed a notice of appeal and has not responded to the State's assertion that the notice of appeal filed by the Petitioner was untimely.

Pursuant to Tennessee Rule of Appellate Procedure 4(a), a notice of appeal "shall be filed with and received by the clerk of the trial court within 30 days after the date of entry of the judgment appealed from[.]" However, the untimely filing of a notice of appeal is not always fatal to an appeal. State v. Rockwell, 280 S.W.3d 212, 214 (Tenn. Crim. App. 2007). Rule 4(a) states that "in all criminal cases the 'notice of appeal' document is not jurisdictional and the filing of such document may be waived in the interest of justice." Tenn. R. App. P. 4(a). "'In determining whether waiver is appropriate, this court will consider the nature of the issues presented for review, the reasons for and the length of the delay in seeking relief, and any other relevant factors presented in the particular case.'" Rockwell, 280 S.W.3d at 214 (quoting State v. Markettus L. Broyld, No. M2005-00299-CCA-R3-CO, 2005 WL 3543415, at *1 (Tenn. Crim. App. Dec. 27, 2005)). Waiver is not automatic and should only occur when mandated by "the interest of justice." If this court were to summarily grant a waiver whenever confronted with untimely notices, the 30 day requirement of Tennessee Rule of Appellate Procedure 4(a) would be rendered a legal fiction. Id.

While the Petitioner's brief contained no explanation or discussion regarding the untimely filing of the notice of appeal, the nature of the issues presented for review mandate waiver. Additionally, the Petitioner immediately filed a notice of appeal when he became aware of his post-conviction counsel's negligence. Accordingly, we choose to waive the timely filing of the notice of appeal.

## II. Ineffective assistance of trial counsel

The burden in a post-conviction proceeding is on the petitioner to prove the factual allegations to support his grounds for relief by clear and convincing evidence. Tenn. Code Ann. § 40-30-110(f); Dellinger v. State, 279 S.W.3d 282, 293-94 (Tenn. 2009). If the petitioner proves his grounds by clear and convincing evidence, the trial court must then determine whether trial counsel was ineffective according to Strickland v. Washington, 466

U.S. 668, 687 (1984). Dellinger, 279 S.W.3d at 293-94. On appeal, we are bound by the trial court's findings of fact unless we conclude that the evidence in the record preponderates against those findings. Fields v. State, 40 S.W.3d 450, 456 (Tenn. 2001). Because they relate to mixed questions of law and fact, we review the trial court's conclusions as to whether counsel's performance was deficient and whether that deficiency was prejudicial under a de novo standard with no presumption of correctness. Id. at 457.

Under the Sixth Amendment to the United States Constitution, when a claim of ineffective assistance of counsel is made, the burden is on the petitioner to show (1) that counsel's performance was deficient and (2) that the deficiency was prejudicial. Strickland, 466 U.S. at 687; see Lockhart v. Fretwell, 506 U.S. 364, 368-72 (1993). Failure to satisfy either prong results in the denial of relief. Strickland, 466 U.S. at 697. In other words, a showing that counsel's performance fell below a reasonable standard is not enough; rather, the petitioner must also show that "there is a reasonable probability" that but for the substandard performance, "the result of the proceeding would have been different." Id. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. The Strickland standard has been applied to the right to counsel under article I, section 9 of the Tennessee Constitution. State v. Melson, 772 S.W.2d 417, 419 n.2 (Tenn. 1989).

In determining whether trial counsel's performance was deficient, this court has held that a "petitioner is not entitled to the benefit of hindsight, may not second-guess a reasonably based trial strategy by his counsel, and cannot criticize a sound, but unsuccessful, tactical decision made during the course of the proceedings." Adkins v. State, 911 S.W.2d 334, 347 (Tenn. Crim. App. 1994). "[D]eference to tactical choices only applies if the choices are informed ones based upon adequate preparation." Cooper v. State, 847 S.W.2d 521, 528 (Tenn. Crim. App. 1992). An attorney's performance must be measured against the general standard of whether the services rendered were "within the range of competence demanded of attorneys in criminal cases." Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975).

A. Cross-examination of Sharon Vickers

The Petitioner contends that trial counsel failed to adequately cross-examine Ms. Vickers because trial counsel did not introduce her prior inconsistent statement. The State responds that trial counsel cross-examined Ms. Vickers on these issues and confronted her with her prior inconsistent statement and that introduction of the police report was precluded

by the rules against hearsay. The State asserts that trial counsel's decision to forego examining the detectives on this issue was based on sound trial strategy because she did not want to recall the witnesses and risk reiterating the State's proof.

In order to prevail on this issue, the Petitioner must prove that the witness made a prior inconsistent statement, that the witness denied making such statement, that trial counsel should have submitted evidence of the prior inconsistent statement, and that trial counsel's failure to submit such evidence was deficient and prejudicial to the Petitioner's case.

At trial, Ms. Vickers testified that she saw the Petitioner in the Four Aces Bar on the night of November 29, 2000 sometime before 5:00 p.m. According to Ms. Vickers, the Petitioner was trying to sell "some clothes on hangers," a television, and a VCR. She also testified that Ms. Mitchell was outside in the Petitioner's white four-door car lying down. On cross-examination, trial counsel asked Ms. Vickers about a prior statement to Detective Fuqua in which she told the detective that the Petitioner was driving a maroon car and was at the Fork and Cork Bar. Ms. Vickers testified that she did not remember this prior statement. Trial counsel also asked Ms. Vickers whether she mentioned anything about the Petitioner having clothing on hangers at the bar to the detectives. Ms. Vickers said that the Petitioner had clothing but that she was not sure if she told the detectives about the clothing. Ms. Vickers admitted that on that day, she "wasn't happy because [she] had to work" for Ms. Mitchell, who was hiding in the Petitioner's car. Upon further questioning, she admitted that she was mad at the Petitioner and Ms. Mitchell.

"Extrinsic evidence of a prior inconsistent statement by a witness is not admissible unless and until the witness is afforded an opportunity to explain or deny the same and the opposite party is afforded an opportunity to interrogate the witness thereon." Tenn. R. Evid. 613(b). "Extrinsic evidence of a prior inconsistent statement remains inadmissible when a witness unequivocally admits to having made the prior statement." State v. Martin, 964 S.W.2d 564, 567 (Tenn. 1998) (citing State v. Grady, 619 S.W.2d 141, 143 (Tenn. Crim. App. 1980)). Ms. Vickers's statements at trial that the Petitioner was trying to sell clothing; that he was only at the Four Aces Bar; and that the Petitioner was in a white car were inconsistent with her statement to Detective Fuqua. Trial counsel confronted the witness on the inconsistencies but did not offer any extrinsic evidence when the witness equivocated in her response. However, when the witness equivocated, the Rules of Evidence permitted trial counsel to introduce the prior statement to impeach the witness's credibility. Neil P. Cohen et al., Tennessee Law of Evidence § 6.13[2][b] (5th ed. 2005).

-10-

When confronted with her decision to forgo further impeachment of this witness, trial counsel explained that she did not want to call Detective Fuqua and risk reiterating the State's proof. That reasoning may have supported trial counsel's decision if Detective Fuqua had testified prior to Ms. Vickers. However, Detective Fuqua was called toward the end of the State's proof, while Ms. Vickers was only the fifth State's witness. While Ms. Vickers's prior statement to Detective Fuqua that the Petitioner was in a maroon car "a few weeks ago" does not necessarily mean that the Petitioner was driving the maroon car on the day of the homicide, Ms. Vickers did not tell Detective Fuqua that the Petitioner was in a white car and was trying to sell clothing at the bar on the day of the homicide. Ms. Vickers's testimony at trial that the Petitioner was seen in a white four-door car and was trying to sell clothing on the day of the homicide was significant and damaging to the Petitioner's theory of the case when the victim owned a white four-door car and when clothing was stolen from the victim's house. Additionally, the fact that Ms. Vickers told Detective Fuqua that the Petitioner went to the Fork and Cork Bar was also important. Following our review, we conclude that trial counsel should have introduced the prior inconsistent statement. However, we do not believe that the Petitioner was prejudiced by this error when the credibility of the witness had already been impeached on these issues during cross-examination. Accordingly, we conclude that the Petitioner has failed to prove that he received ineffective assistance of counsel.

## B. Cross-examination of Vallean Haire

The Petitioner contends that trial counsel failed to establish, through her cross-examination of Vallean Haire, that Ms. Vickers was a biased witness. The State responds that the Petitioner failed to prove that counsel was ineffective in this regard because he did not establish that the witness was biased. The State asserts that trial counsel could not ask Ms. Haire about Ms. Vicker's potential bias because the proper form of impeachment for bias required trial counsel to confront Ms. Vickers, not another witness. Therefore, the State alternatively responds that counsel's decision to forego this type of cross-examination of Ms. Vickers was based on sound trial strategy and should not be second-guessed.

"The exposure of a witness's motivation in testifying is a proper and important function of cross-examination." State v. Sayles, 49 S.W.3d 275, 279 (Tenn. 2001) (citing Deleware v. Van Arsdall, 475 U.S. 673 ,678-79 (1986)). "[F]eelings that a witness has with regard to a party or issue is an important factor for the trier of fact to consider in assessing the weight to be given to the witness' testimony." State v. Williams, 827 S.W.2d 804, 808 (Tenn. Crim. App. 1991). This type of evidence "is always competent to prove the friendliness or unfriendliness of a witness, his partiality for one party or hostility to the other,

-11-

in order that the jury may judge of his credibility and the trustworthiness of his testimony." Creeping Bear v. State, 87 S.W. 653 (Tenn. 1905).

In Tennessee, "[a] party may offer evidence by cross-examination, extrinsic evidence, or both, that a witness is biased in favor of or prejudiced against a party or another witness." Tenn. R. Evid. R. 616. Rule 616 does not require counsel to first confront the witness with their alleged bias. Additionally, regardless of whether the witness admits or denies the bias, counsel is not precluded from introducing extrinsic evidence to further illustrate the witness's bias if the proposed evidence complies with the remaining rules of evidence. Extrinsic evidence may take the form of testimony from another witness who had knowledge of the witness's bias.

In this case, trial counsel knew that Ms. Haire fired Ms. Vickers because of information supplied by the Petitioner. Ms. Haire testified at the post-conviction hearing that her employees viewed the Petitioner as a "narc" and that the Petitioner frequently informed Ms. Haire about her employees' behavior at the bar when she was not present. When trial counsel was confronted with her failure to elicit this information, trial counsel explained that she did not believe that Ms. Vickers had a "huge axe to grind" with the Petitioner.

If Ms. Vickers had been confronted with her potential bias, she may well have testified that she did not have any ill feelings toward the Petitioner. However, the jury was precluded from assessing the witness's potential bias against the Petitioner when weighing the witness's credibility. A witness's bias is always an important factor in a case, but in this case, Ms. Vickers's bias was an especially important factor as she was the only witness who testified that the Petitioner was selling stolen items from the victim's residence. Ms. Vickers's testimony directly contradicted the Petitioner's theory of defense that he refused to participate in the theft. Trial counsel should have provided evidence of the witness's potential bias. However, we do not believe that trial counsel's decision prejudiced the Petitioner when trial counsel discredited Ms. Vickers on several other points relative to her version of events on the night of the murder. Trial counsel also provided the jury with some evidence of bias when Ms. Vickers admitted on cross-examination that she was mad at both Ms. Mitchell and the Petitioner. Ms. Vickers explained that she had to work for Ms. Mitchell because Ms. Mitchell was with the Petitioner. Accordingly, we conclude that the Petitioner has failed to prove that he was prejudiced by trial counsel's error.

C. Jan Crow Beech's statements

The Petitioner contends that trial counsel was ineffective because she failed to lay the proper foundation for impeachment testimony concerning Ms. Beech. The Petitioner contends that because counsel failed to ask Ms. Beech about statements she made to her

-12-

estranged husband, the trial court precluded crucial testimony that would have proven that the co-defendant and Ms. Beech murdered the victim. The State responds that trial counsel attempted to illicit this information from Ms. Beech but that Ms. Beech stated that she did not remember what she told Mr. Veach. The State further responds that the Petitioner has failed to show that he was prejudiced by counsel's alleged ineffectiveness when the statements would not have exonerated the Petitioner.

In a jury-out hearing at trial, Mr. Veach testified that after he and Ms. Beech heard a message from their daughter about the victim's murder, Ms. Beech called someone. After speaking with the unidentified person, Ms. Beech mumbled that the victim was not supposed to die but that the victim had been killed with a can of chili – a fact not known by the investigators at that time. When trial counsel attempted to elicit this information from Mr. Veach, the trial court excluded the statement because counsel failed to provide Ms. Beech with the opportunity to deny the statements during cross-examination. The trial court further found that the statements could not be considered as an excited utterance. The trial court explained that when Mr. Veach was asked how Ms. Beech reacted to the news of the victim's death, Mr. Veach said, "[she] wouldn't care if her mother was dead, wouldn't bother her, if you want to know the truth."

The record clearly indicates what occurred in the trial court during Ms. Beech's cross-examination,

| Counsel: | Do you recall getting off the phone with your daughter, being very upset and saying they killed him with a chili can to Clayton? |
|---|---|
| State: | Objection, hearsay. |
| Counsel: | This is her statement. |
| Court: | Well, approach the bench, please. |
| State: | Back door hearsay, Your Honor. |
| Court: | Well, what's the point of her - - |
| Counsel: | She made some phone calls after she talked to her daughter or said some phone calls came into her and she said - - told Mr. Veach all upset they killed him with a chili can. Well, the detectives at that time, they didn't even know how he was killed |

. . . . [T]hey did not tell the daughter that. She found out from another source.

Court: What's the source?

Counsel: Mr. Lopez.

State: Who?

Counsel: Lopez.

Court: Is she going to testify to that? She said she's never seen him since the night of the 22nd.

Counsel: Okay. I'll ask her a different question.

. . .

Counsel: Who else did you talk to besides your daughter that day?

Witness: A detective.

Counsel: Anyone else?

Witness: That day?

Counsel: Uh-uh. (Affirmative)

Witness: The police. I talked with the police.

Counsel: Did you find out about what had happened to Mr. Craig when you were driving back from Columbia with - back to Nashville with Mr. Veach?

Witness: Yeah.

Counsel: I'm sorry. Did you talk to anyone else other than the detective and your daughter?

Witness: No. I don't remember.

-14-

. . .

Counsel:      Did you tell Mr. Veach what had happened while you were riding back from Columbia?

Witness:      [D]id I tell Clayton what happened?

Counsel      Yes, I'm sorry.

Witness:      I don't - - we were just talking. We didn't know what happened until we talked with the police officer. Well, until I did.

Counsel:      Let me rephrase. So when you got off the phone with the news from your daughter - -

Witness:      I was in shock. I didn't really believe it but . . .

Counsel:      But you were in the car. Did you tell him the news that you had just received?

Witness:      He got it first.

. . .

Counsel:      Do you recall what you told [Mr. Veach] after you got off the phone with your daughter?

Witness:      No.

Counsel:      Just said something bad had happened to Mr. Craig?

Witness:      I mean, I don't know word for word what was said. I don't know what you're trying to get me to say.

Counsel:      Do you remember what you said?

Witness:      I just said Billy's dead. Billy - - somebody killed Billy
and then it sunk into my head, you know, what would
have happened if I had been there.

Counsel:　　Fair.

Witness:　　I guess they would have killed me too.

When trial counsel attempted to elicit information from Mr. Veach regarding the statement about the chili can, the trial court held a jury-out hearing and conducted an extensive examination of Mr. Veach regarding Ms. Beech's statements. Mr. Veach testified that when Ms. Beech hung up the phone, she mumbled something about a chili can and said that the victim was not supposed to be killed. Trial counsel attempted to argue that the statements were an excited utterance and that they were inconsistent with Ms. Beech's prior statements.

When asked why she did not lay the proper foundation for admitting the statement as a prior inconsistent statement, trial counsel said,

> To the best of my recollection I either did or attempted to and was objected. And I just honestly don't remember. There's been a lot of testimony here over the past four days. Obviously I knew about it and that was - - it's in my notes and I thought I did. And I'll - -

The trial court responded, "I don't recall you laying the foundation for that statement." At the end of the hearing, the trial court said,

> Well, the objection is sustained. There's no hearsay rule here. The defense did not lay foundation as an excited utterance. Can't use the declaration against interest because there's obviously an available witness. We heard from her. It's not really admissible to impeach for two reasons. One, the Tennessee Supreme Court decided about three years ago that you have to lay a foundation. I think that case is State v. Walker. And secondly, you know, without laying that foundation, I can't determine whether it really impeaches anything.
>
> Now, I could use State v. Brown and Chambers v. Mississippi to override the evidence rules, yes, but that would be only under circumstances in which this evidence was really crucial and pointed the finger at someone else. You know, let's even accredit this statement, he [wasn't] supposed to get killed. All that tells me is that she might have been involved in this theft murder. It doesn't indicate that these two defendants are not guilty. That's all it tells me.

-16-

Following our review, we conclude that trial counsel attempted to and eventually asked the witness whether she knew anything about the murder and whether she said anything to her husband about the murder. Accordingly, we also conclude that the Petitioner has failed to prove his allegations of fact – that trial counsel failed to confront the witness with her prior inconsistent statement – by clear and convincing evidence.

### D. Motion for new trial hearing

The Defendant contends that trial counsel was aware of juror impropriety in the trial and that with more than five months to prepare for the motion for new trial hearing, she should have prepared affidavits of this evidence or brought the jurors before the court. The State responds that the Petitioner has failed to show that trial counsel was ineffective because these jurors did not testify at the post-conviction hearing. The State further responds that counsel's decision to forego eliciting testimony from the jurors at the motion for new trial hearing was an informed decision.

Trial counsel stated that she received two responses from her letters to the jurors and that the responses would not have helped the Petitioner at the motion for new trial hearing. Moreover, this court has long held that "[w]hen a petitioner contends that trial counsel failed to discover, interview, or present witnesses in support of his defense, these witnesses should be presented by the petitioner at the evidentiary hearing." Black v. State, 794 S.W.2d 752, 757 (Tenn. Crim. App. 1990). The jurors who had allegedly succumbed to pressure to reach a verdict were not called as witnesses. Accordingly, we conclude that the Petitioner has failed to prove that he was prejudiced by trial counsel's failure to present the jurors at the motion for new trial hearing.

### E. Failure to communicate

The Petitioner contends that trial counsel failed to communicate with him, failed to properly advise him about the elements of the offense, failed to discuss her trial strategy, and failed to communicate any plea offers provided by the State. The Petitioner contends that as a result of trial counsel's failure to discuss her trial strategy with him, he was forced to testify because she admitted that he was at the victim's residence on the night of the murder during her opening statement. The State responds that the post-conviction court's finding that trial counsel met with the Petitioner on numerous occasions and discussed the evidence, his right to testify, and the goals of the trial was supported by the record. The State also responds that the Petitioner was never offered any plea agreements.

-17-

The post-conviction court credited trial counsel's assertion that she met with the Petitioner on several occasions and discussed the case and their trial strategy. The evidence introduced at trial and at the post-conviction hearing supports this assertion. Trial counsel presented six witnesses on behalf of the Petitioner and presented an elaborate theory of defense at trial. Trial counsel stated that she discussed this theory with the Petitioner and that they agreed on the Petitioner's decision to testify given their theory of the case. Indeed, trial counsel's entire defense centered around the Petitioner's version of events that were presented at trial through his testimony. Relative to the Petitioner's assertion that trial counsel failed to communicate offers from the State, trial counsel stated that she never received any offers from the State. Following our review, we conclude that the record does not preponderate against the post-conviction court's finding that trial counsel adequately communicated with the Petitioner prior to trial.

### F. Closing argument

The Petitioner contends that trial counsel erroneously stated that the Petitioner had the victim's blood on his boots during her closing argument and that this misstatement of the evidence unfairly prejudiced his defense. The State responds that trial counsel was not ineffective for misstating the evidence in her closing argument when the Petitioner admitted that he could have had the victim's blood on his boots. The State further responds that the Petitioner cannot show that he was prejudiced by counsel's statement when the Petitioner has failed to show that there is a reasonable probability that counsel's misstatement affected the outcome of the trial.

During closing argument, trial counsel stated,

And his boots, if he had thrown up that makes sense. If you're kind of living on the street or out on the street, he threw up on the street and threw up on his boots. And I'll tell you, I don't know how - - on the mixture of blood how [the victim's] blood got on his boots. It wasn't a lot. It was a little tiny spot. We're not going to make something up for convenience sake. We can only tell the truth. I don't know and neither does [the Petitioner]. It could have been walking through the kitchen. It could have been when [the victim] fell towards him.

At the post-conviction hearing, counsel admitted that she misstated the evidence in her closing argument but explained that she did not believe her error affected the result of the Petitioner's case.

Trial counsel's argument was not evidence. See State v. Banks, 271 S.W.3d 90 (Tenn. 2008) (concluding that jurors were presumed to follow the trial court's instruction that "arguments of counsel are not evidence and are to be disregarded if not supported by the evidence"). Additionally, the jury in this case was instructed prior to closing argument that the arguments of counsel could not be considered as evidence. Id. However, closing arguments must be "temperate, must be predicated on evidence introduced during the trial of the case, and must be pertinent to the issues being tried." Russell v. State, 532 S.W.2d 268, 271 (Tenn. 1976). While trial counsel was attempting to lessen the Petitioner's responsibility for the crime, she misstated the testimony presented at trial. Trial counsel's statements suggested to the jury that there was physical evidence that the victim's blood was on the Petitioner's boot. An error of this magnitude in closing argument was not based on sound trial strategy and was not within the "wide range of professionally competent assistance." Strickland, 466 U.S. at 690. Accordingly, such an error amounts to deficient representation.

Having concluded that trial counsel was deficient in her representation of the Petitioner during closing argument, we must now determine whether there is a reasonable probability that without the misstatement, the result of the proceeding would have been different. Trial counsel stated that Juror Godchax told her that the mixture of blood on the Petitioner's boot was one of the deciding factors in his decision to convict the Petitioner. However, we cannot conclude that trial counsel's misstatement deprived the Petitioner of a fair trial when the physical evidence at trial suggested that it was possible that the victim's blood was on the Petitioner's boot. The Petitioner admitted at trial that he was in close proximity to the victim when Mr. Lopez was hitting the victim with the can. Additionally, closing arguments are not evidence and cannot be considered as evidence. Accordingly, we conclude that the Petitioner has failed to prove that there is a reasonable probability that the result of the trial would have been different had trial counsel not made this erroneous statement.

### III. Ineffective assistance of appellate counsel

The Petitioner contends that appellate counsel was ineffective for failing to present the trial court's ruling against trial counsel regarding Ms. Beech's statements to Mr. Veach as an issue on appeal. The State responds that the Petitioner failed to show that appellate counsel was ineffective for failing to raise this issue on appeal because Ms. Beech's statements were not critical to the defense. The State asserts that the statements only implicated Ms. Beech as an accomplice in the murder and did not exonerate the Petitioner.

In determining whether appellate counsel's failure to raise an issue on appeal constitutes ineffective assistance of counsel, our supreme court has held that "unless the

omitted issue has some merit, the petitioner suffers no prejudice from appellate counsel's failure to raise the issue on appeal. When an omitted issue is without merit, the petitioner cannot prevail on an ineffective assistance of counsel claim." Carpenter v. State, 126 S.W.3d 879, 887-88 (Tenn. 2004) (citing United States v. Dixon, 1 F.3d 1080, 1083 (10th Cir. 1993)). "Generally, the determination of which issues to present on appeal is a matter which addresses itself to the professional judgment and sound discretion of appellate counsel" as these are "tactical and strategic choices," which should not be second-guessed. Cooper v. State, 849 S.W.2d 744, 747 (Tenn. 1993). Thus, to prevail on this issue, the Petitioner must establish that the trial court erroneously excluded the statement at trial; that appellate counsel erroneously failed to raise the issue on appeal; and that the Petitioner was prejudiced by appellate counsel's failure to raise the issue.

Because trial counsel confronted Ms. Beech with her prior inconsistent statements to Mr. Veach, the trial court erred in refusing to admit the evidence. Appellate counsel should have raised the trial court's error as an issue on appeal. However, appellate counsel's failure to raise the issue did not prejudice the Petitioner on appeal because the error by the trial court was harmless. Here, the statements would not have lessened the Petitioner's responsibility for the crime or provided any evidence to rebut his participation. The statements merely reflect that Ms. Beech may have been involved in the planning of the theft and that someone, other than the investigators, told her how the victim was killed. Accordingly, we conclude that appellate counsel was not ineffective for failing to pursue the issue on appeal.

## IV. Cumulative error

The Petitioner contends that the cumulative effect of the errors in his case resulted in a trial that was fundamentally unfair; therefore, he is entitled to a new trial. The State responds that the Petitioner has failed to show that trial counsel erred in her representation of the Petitioner; therefore, the Petitioner is not entitled to cumulative error relief.

"We recognize that while individual errors may not necessitate [relief], the combination of multiple errors may necessitate reversal of a conviction in order to ensure a [petitioner] receives a fair trial." Chad Hughes v. State, No. M2008-01531-CCA-R3-PC, 2009 WL 1409776, *7 (Tenn. Crim. App. May 19, 2009) (citing State v. Zimmerman, 823 S.W.2d 220, 228 (Tenn. Crim. App. 1999)). Following our review, we concluded that trial counsel erred in failing to confront Ms. Vickers with a prior inconsistent statement; in failing to confront Ms. Vickers with her bias against the Petitioner; and in misstating the evidence during closing argument. We also concluded that the trial court erred in refusing to admit Ms. Beech's prior inconsistent statement. However, we believe that cumulative error relief is not warranted given the facts of the Petitioner's case.

Had these errors at trial not occurred, the jury would been provided with extrinsic evidence of Ms. Vickers's inconsistent statements and bias, would have learned that Ms. Beech had likely been involved in the victim's murder, and would have been reminded that there was no scientific evidence to prove that the victim's blood was on the Petitioner's boot. The absence of this information did not affirmatively affect the results of the trial when the Petitioner admitted that he was present when Mr. Lopez killed the victim, that he observed the fight between Mr. Lopez and the victim, that he did not help the victim, and that he fled the victim's home with Mr. Lopez. Accordingly, we conclude that the errors, taken together, did not affirmatively affect the result of the trial or prevent the Petitioner from receiving a fair trial when the absence of the errors would not have lessened the State's proof of the Petitioner's involvement in the murder.

## CONCLUSION

In consideration of the foregoing and the record as a whole, the judgment of the post-conviction court is affirmed.

_____
D. KELLY THOMAS, JR., JUDGE

-21-