STATE of Tennessee, Appellee,

v.

Alger WILLIAMS, Appellant.

Court of Criminal Appeals of Tennessee,
at Knoxville.

June 26, 1991.

James T. Bowman, Johnson City, for appellant.

Charles W. Burson, Atty. Gen. & Reporter, Bettye Springfield–Carter, Asst. Atty. Gen., Nashville, David E. Crockett, Dist. Atty. Gen. and William R. Mooney, Asst. Dist. Atty. Gen., First Judicial Dist., Jonesborough, for appellee.

## OPINION

SUMMERS, Judge.

In this case we are confronted with the question of whether appellant, Alger Williams, can be retried for the unlawful sale of a Schedule II controlled substance. Initially he was indicted for selling approximately one-eighth (⅛) ounce of cocaine. He was later reindicted for selling 1.33 grams of a white powder containing methamphetamine, a Schedule II controlled sub-

stance. A jury trial commenced on this charge and after receiving the testimony of four witnesses for the prosecution, the trial court declared a mistrial. The court then set a date for a new trial, but suggested that the case be appealed to this court for a determination of whether a second trial would violate constitutional double jeopardy proscriptions. We granted this appeal pursuant to Rule 9, T.R.A.P.

Appellant's arrest and subsequent indictment arose from an alleged drug transaction on April 25, 1988. The First Judicial Drug Task Force recorded communications which took place during the transaction by the use of a transmitter worn by a confidential informant, Marlene Smith. Agent Charlie Beard was present with Ms. Smith during the transaction.

Marlene Smith was a student at East Tennessee State University at the time of this incident. She became involved with the Drug Task Force after being arrested for selling cocaine. She agreed to cooperate with the Drug Task Force by providing information about other individuals who might have been involved with illegal drugs. Ms. Smith was acquainted with appellant because she had tutored him in the athletic department of the university. She initially contacted appellant to see if he could obtain cocaine for her. After several conversations with appellant, they arranged a meeting. She communicated this information to the Drug Task Force who organized a surveillance operation. Arrangements were made for Ms. Smith to carry a hidden transmission device, and Agent Beard provided her with $200.00 to accomplish the purchase. According to Ms. Smith's testimony, these events culminated with the purchase of a white powdery substance which was later determined to contain methamphetamine.

Also testifying on behalf of the state was Officer Lawrence Brown who worked with the Drug Task Force in conducting the surveillance of the alleged drug sale. Agent Brown was in a parked vehicle near the location where Ms. Smith and Agent

Beard met with appellant. Although Agent Brown could not see the events taking place, he was listening to these events on the police radio as they were being transmitted and recorded. Subsequent to the alleged transaction and after appellant departed from the scene, Agent Beard delivered to Agent Brown a small plastic bag containing a white powdery substance. He placed the bag and its contents in a locked storage cabinet in the office. The evidence was later delivered to the crime laboratory for analysis.

David Holloway, of the Tennessee Bureau of Investigation Crime Laboratory, analyzed the substance and identified the evidence as 1.34 grams of a substance containing methamphetamine.

The last witness to testify before the mistrial was declared was Agent Keith Love. Love was one of the agents involved in the surveillance of this incident. Agent Love was called to testify on two occasions during the state's case. On the second occasion, he testified about a purported confession given by appellant apparently after he was charged, but before he was actually arrested. He stated that Agents Brown and Beard were also present when appellant made this incriminating confession. The state's sole purpose of recalling Agent Love was to elicit this testimony about appellant's extrajudicial statement. Counsel for appellant was surprised by Love's testimony because he had not previously been informed that such a statement had been made. In addition, Agents Brown and Love had already testified earlier in the trial and had not mentioned this statement.

On cross-examination, counsel asked Agent Love if he was racially prejudiced. The record does not explicitly address this subject; but it becomes clear as cross-examination continues, that appellant is an African–American. Love and the other officers involved in this case are Caucasian. Agent Love answered that he was not prejudiced and that race had absolutely nothing to do with his investigation of this case.

Upon receiving this answer, defense counsel informed the court that he had an audio tape that he wanted to play in open court. This tape contained the recorded conversation which took place during the alleged transaction for which appellant was being tried. At the beginning of the tape was a conversation which apparently was unrelated to this case. At the end of the tape was a conversation among various officers who were involved in the surveillance of the incident. This latter conversation took place immediately after appellant had departed the scene. The officers were discussing the events that had just taken place, as well as their plans for concluding the operation. The state had provided appellant with this tape, and it had a copy of the tape as well.

The prosecutor objected to the playing of the tape because "the first part of the tape [did not] have anything to do with this case." Defense counsel had no desire to play the unrelated first portion of the tape and assured the court that he had it keyed to a relevant part of the tape. The court allowed counsel to proceed. He began the tape where the officers were talking about the transaction that had just occurred. The pertinent part of the recorded conversation was as follows:

Unidentified Officer: I'll go on to the office whichever you want me to.

Unidentified Officer: Go on to the office he (appellant) just passed me.

Unidentified Officer: He just walked right by us.

Unidentified Officer: Okay. Then I'm gone.

Unidentified Officer: We're going to see what he gets in and drives off in.

Unidentified Officer: He said he didn't have no wheels is why she (Ms. Smith) had to meet him there.

Unidentified Officer: Is he living on campus?

Unidentified Officer: Ten four.

Unidentified Officer: He read her the riot act, didn't he?

Unidentified Officer: Yeah, he was mad because he had to wait, wasn't it?

At this point counsel stopped the tape and asked Agent Love if he recognized those voices. Love recognized his voice. He further believed that Agent Brown (who had testified earlier in the trial), and another agent named Sherrill were also involved in the conversation. Counsel then continued playing the tape:

Unidentified Officer: I ain't sure what all he was a saying.

Counsel then asked Agent Love who made that statement. Love responded that that was Agent Brown. The state then objected on grounds of relevancy, but the court allowed counsel to continue:

Unidentified Officer: He said, man I can't be busted no more, man I can't be taking no mother fucking chances, you know what I mean bitch.

This statement was made with the obvious attempt to insultingly imitate an African-American. Counsel asked Love who made this derogatory statement. Love stated that it sounded like Agent Sherrill. The recorded conversation continued:

Unidentified Officer: Very good translation.

With regard to this statement, the court reporter typed "indiscernible." We have listened to the tape, and it is clear to us that the officer was complimenting the previous speaker on his translation of appellant. Counsel asked Love about that voice. Love responded, "[a]gain, it sounded like Agent Brown." Finally, the last part of the tape was played for the jury:

Unidentified Officer: He said man Tobbie ain't no dumb nigger, just don't cut my feets off.

Agent Love denied that he made this statement. As defense counsel began to ask further questions about these communications, the state asked for a conference with the court out of the jury's presence. The state argued to the court that since one of the jurors was black, a fair trial was impos-

sible. The trial court declared a mistrial pursuant to the state's request. Defense counsel objected to the mistrial.

At a later proceeding, appellant made a motion for a judgment of acquittal on the ground that a second trial would place him twice in jeopardy. We are in agreement with appellant's constitutional argument; and for that reason, we hold that the indictment in this case should be dismissed.

■ The Tennessee and United States Constitutional provisions barring double jeopardy protect a criminal defendant from the perils of both a second punishment and a second trial for the same offense. *Whitwell v. State*, 520 S.W.2d 338 (Tenn.1975). This does not mean, however, that every time a defendant is subjected to a trial before a competent tribunal he is entitled to go free if the trial fails to end in final judgment. *Wade v. Hunter*, 336 U.S. 684, 69 S.Ct. 834, 93 L.Ed. 974 (1949); *State v. Nixon*, 669 S.W.2d 679 (Tenn.Crim.App. 1983). This Court has recognized situations where a second trial can be imposed upon a criminal defendant after a mistrial has been declared. One such situation is where "manifest necessity" demanded a mistrial in the first instance. Where it appears to the court that some matter has occurred which would prevent the proceeding of a trial without manifest injustice to the defendant or the public, a mistrial may be declared; and a claim of double jeopardy would not prevail on a subsequent trial. *State v. Malouf,* 199 Tenn. 496, 287 S.W.2d 79 (1956); *Arnold v. State*, 563 S.W.2d 792 (Tenn.Crim.App.1977).

The Double Jeopardy Clause of the Fifth Amendment protects a criminal defendant from repeated prosecutions for the same offense. (Citation omitted). As a part of this protection against multiple prosecutions, the Double Jeopardy Clause affords a criminal defendant a "valued right to have his trial completed by a particular tribunal." (Citation omitted).

*Oregon v. Kennedy,* 456 U.S. 667, 671, 102 S.Ct. 2083, 2087, 72 L.Ed.2d 416 (1982).

■ The doctrine of manifest necessity prohibits the trial court from foreclosing the accused's valued right to have his initial trial concluded to a final judgment unless a scrupulous exercise of judicial discretion leads to the conclusion that the ends of public justice would not be served by a continuation of the proceedings. *United States v. Dinitz,* 424 U.S. 600, 96 S.Ct. 1075, 47 L.Ed.2d 267 (1976). The United States Supreme Court explained in *Arizona v. Washington,* 434 U.S. 497, 503–505, 98 S.Ct. 824, 829–830, 54 L.Ed.2d 717 (1978), several reasons that this "valued right" merits constitutional protection:

> Even if the first trial is not completed, a second prosecution may be grossly unfair. It increases the financial and emotional burden on the accused, prolongs the period in which he is stigmatized by an unresolved accusation of wrongdoing, and may even enhance the risk that an innocent defendant may be convicted. Consequently, as a general rule, the prosecutor is entitled to one, and only one, opportunity to require an accused to stand trial. (Footnotes omitted).

In light of the importance of the defendant's right to have the trial concluded by a particular tribunal and the fact that this right is thwarted by a mistrial, the prosecution must bear the burden of demonstrating the manifest necessity for and the lack of feasible alternatives to a mistrial if the defendant is to be tried a second time. See *Arizona v. Washington,* 434 U.S. at 505, 98 S.Ct. at 830.

■ The determination of whether a retrial should be allowed depends upon the circumstances of each case. The trial court must weigh the right of the public to a fair and complete adjudication against the constitutional right of the defendant to be free from harassment and oppression by successive trials. *Gori v. United States,* 367 U.S. 364, 81 S.Ct. 1523, 6 L.Ed.2d 901 (1961). The trial court's discretion in weighing these factors is open to review by appellate courts, and any doubts shall be resolved "in favor of liberty of the citizen." *Arnold*

*v. State,* 563 S.W.2d at 795 (quoting *Downum v. United States,* 372 U.S. 734, 83 S.Ct. 1033, 10 L.Ed.2d 100 (1963)).

As we interpret the legal authority explained above, we believe that a two-step analysis should be conducted in this case to determine whether double jeopardy bars a second trial of appellant. First, there is the threshold question of whether the portion of the audio tape in question was admissible. If it was properly admitted, then certainly the trial should not have been aborted. If, on the other hand, the tape should not have been played for the jury, we must then determine whether the prosecution met its burden of proving that there was a manifest necessity for a mistrial.

■ We first undertake to determine the admissibility of the tape recording. Counsel offered the tape recording into evidence for the purpose of impeaching the credibility of one or more state witnesses by showing prejudice against appellant. The feelings that a witness has with regard to a party or issue are an important factor for the trier of fact to consider in assessing the weight to be given to the witness' testimony. *Tennessee Law of Evidence* § 612 (2nd Ed.1990). The law in Tennessee has long been that such evidence is admissible. As early as 1905, our Supreme Court proclaimed:

> It is always competent to prove the friendliness or unfriendliness of a witness, his partiality for one party or hostility to the other, in order that the jury may judge of his credibility and the trustworthiness of his testimony. It is the experience of trial courts that witnesses are often as much influenced in testifying by feelings of friendship or hostility to parties to the case as by direct pecuniary interest in the result of the trial....

*Creeping Bear v. State,* 113 Tenn. 322, 87 S.W. 653 (1905). See also *State v. Lewis,* 803 S.W.2d 260 (Tenn.Crim.App.1990); *State v. Horne,* 652 S.W.2d 916 (Tenn.Crim. App.1983).

■ Federal cases consistently hold that proof of bias or prejudice is almost always relevant because a jury may assess such evidence to bear on the accuracy and truth of certain testimony. Extrinsic evidence may be presented which relates to beliefs of the witness or to preexisting relationships between the witness and the defendant which are of a nature likely to result in bias for one party or prejudice against another. See *United States v. Abel,* 469 U.S. 45, 105 S.Ct. 465, 83 L.Ed.2d 450 (1984); *United States v. Meyer,* 803 F.2d 246 (6th Cir.1986).

The recently promulgated Tennessee Rules of Evidence include Rule 616 which is consistent with prior Tennessee and federal case law:

**RULE 616. IMPEACHMENT BY BIAS OR PREJUDICE**

A party may offer evidence by cross-examination, extrinsic evidence or both, that a witness is biased in favor of or prejudiced against a party or another witness.

Whereas the Federal Rules of Evidence do not specifically provide for this type of impeachment evidence, it is interesting to note that the drafters of our Rules included such a provision in order to eliminate any doubt. A witness may be impeached by cross-examination and/or extrinsic evidence for the purpose of illustrating his prejudice.

In this case, defense counsel had not concluded his cross-examination of Agent Love before a mistrial was declared. Had the trial court allowed the cross-examination to be completed, perhaps the record would have revealed more clearly which agents made which statements and in what context they were made. We do not have the benefit of such revelation. What is clear, however, is that both Agent Love and Agent Brown took part in the recorded conversation. Moreover, according to Love's testimony, Agent Brown apparently expressed approval and even complimented another agent who attempted an insulting and derogatory impersonation of appellant. It is very likely that the jury would have interpreted at least part of these communications as racial remarks.

When directing the entry of a mistrial in this case, the trial court made certain contemporaneous statements as a means of explanation. A portion of these remarks are as follows:

Before you bring the jury out, let me make another statement. Now, I know that blacks make references to whites, and whites make references to blacks, but the fact that blacks call whites "honkies," and that whites call blacks "niggers," ... doesn't necessarily mean that they would do things like [defense counsel has] indicated.... Some people will make references and call people names, but will not change evidence.... I guess everybody is racially prejudiced to some degree in some way, but I don't think that the fact that any of these officers referred to this defendant as a "nigger" would necessarily mean that they would manufacture evidence, or be prejudiced, or go after him, or go out to get him just because he's black.

We agree with the trial court that simply because a person displays racial prejudice, however distasteful, it does not necessarily follow that that person will manufacture evidence or lie on the witness stand. We disagree with the court, however, with its insistence on granting a mistrial when the jury is informed that a witness may have displayed such prejudice against a certain race in general or this defendant in particular. The jury should have been entitled to determine if any of the state's witnesses exhibited racial prejudice and if so, whether such hostility affected any of the witnesses' testimony. Arguably, counsel could have laid a more proper foundation prior to playing the tape in the presence of the jury. See *McCormick on Evidence* § 40 (3rd Ed.1984). However, we believe a discussion on the procedural requirements surrounding Rule 616, Tenn.R.Evid., is better left for another day. In our opinion,

the evidence in question was relevant and admissible.

■ We also believe that even if the audio tape was irrelevant and inadmissible, there was clearly a method of curing the error which would have been much less drastic than granting the state's request for a mistrial. Assuming *arguendo* that the statements on the tape were not made by any of the witnesses or that the trial court found such statements to be irrelevant to any material issue, then a curative admonition could have been given by the court to the jury. For example, the court could have explained to the jurors that the statements they had just heard were not made by the witnesses presented in this case nor did they involve the drug transaction which allegedly took place in this case. There is no reason to believe that a jury would not heed such an instruction. Clearly, the state did not meet its heavy burden of demonstrating the manifest necessity for and lack of feasible alternatives to a mistrial. See *Arizona v. Washington,* supra.

In summary, we believe that the recorded conversation of the officers involved in this case was relevant to impeach one or more of the state's witnesses on the ground of prejudice. Had counsel been allowed to conclude his cross-examination, the record could have answered this question even more clearly. In any event, even if the tape was irrelevant, we are unable to discern a manifest necessity for a mistrial. Feasible alternatives were available. Thus,

we are of the opinion that constitutional principles of double jeopardy require this Court to reverse the trial court's decision to conduct a second trial.

For the foregoing reasons, the judgment of the trial court is reversed; and the case is dismissed.

BIRCH, J., and WILLIAM H. INMAN, Special Judge, concur.

BIRCH, Judge, concurring.

I concur with my colleagues in the result reached that defendant's re-trial is barred by double-jeopardy limitations.

I write separately, however, to condemn the senseless use of racial epithets in court and related proceedings by those sworn to enforce and uphold the law. The insensitive use of the epithets in this case, even when generously interpreted, invites the sure perception that the user is not as fair, impartial, and enlightened as required to be.