IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs December 17, 2019

## MICHAEL E. STEWART v. STATE OF TENNESSEE

**Appeal from the Criminal Court for Polk County**
No. 17-CR-57 ECN          Andrew M. Freiberg, Judge

_____

### No. E2019-00859-CCA-R3-ECN
_____

The Petitioner, Michael E. Stewart, filed a petition for a writ of error coram nobis in the Polk County Criminal Court, claiming that newly discovered evidence revealed the investigating officer in his case participated in the bystander jury selection process used at his trial and that the statute of limitations should be tolled. After an evidentiary hearing, the coram nobis court denied the petition. On appeal, the Petitioner contends that our supreme court's rules prevented him from receiving a fair coram nobis hearing by depriving him of an investigator; that the coram nobis court erred by inquiring into the Petitioner's relationship with his "main" witness at the hearing; and that the coram nobis court should have granted his petition. Based upon our review of the record and the parties' briefs, we find no reversible error and affirm the judgment of the coram nobis court.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and ALAN E. GLENN, JJ., joined.

Sheridan C. F. Randolph, Cleveland, Tennessee, for the Appellant, Michael E. Stewart.

Herbert H. Slatery III, Attorney General and Reporter; Nicholas W. Spangler, Senior Assistant Attorney General; Stephen Davis Crump, District Attorney General; and Matthew Lewis Dunn, Assistant District Attorney General, for the Appellee, State of Tennessee.

### OPINION

### I. Factual Background

On November 16, 2005, a Polk County Criminal Court Jury convicted the Petitioner of first degree premeditated murder, first degree felony murder, kidnapping, and tampering

with evidence. The convictions resulted from the Petitioner's beating Willard Trentham to death during a fight on July 20, 2002. See State v. Michael E. Stewart, No. E2007-00841-CCA-R3-CD, 2009 WL 1328871, at *1-7 (Tenn. Crim. App. at Knoxville, May 13, 2009). One of the State's witnesses at the Petitioner's trial was Detective Joe Price, a patrol officer who had responded to the scene and had investigated the case. See id. at *1.

The trial court sentenced the Petitioner to a total effective sentence of life plus eight years. On direct appeal of his convictions, the Petitioner claimed that the evidence was insufficient to support the convictions and that the trial court erred by allowing Detective Price to testify that the Petitioner was taken into custody on outstanding warrants after the victim's death. Id. at *8, 10. This court affirmed the Petitioner's convictions. Id.

Our supreme court denied the Petitioner's application for permission to appeal. In July 2009, he filed a timely petition for post-conviction relief, claiming that he received the ineffective assistance of counsel on multiple grounds. Michael E. Stewart v. State, No. E2015-00418-CCA-R3-PC, 2016 WL 3621440, at *6 (Tenn. Crim. App. at Knoxville, June 29, 2016). He also claimed that his jury was unconstitutionally empaneled. Id. The trial court held an evidentiary hearing on December 15, 2014, and denied relief, and the Petitioner appealed to this court. Regarding the jury issue, this court explained as follows:

> At the post-conviction hearing, trial counsel testified that during jury selection, the trial court ran out of potential jurors and that police officers brought people into the courtroom from the street to serve as potential jurors. He agreed he did not have background information on these potential jurors. Counsel assumed he objected to the "rounded up" jurors but said he did not have independent recollection of his objection. Counsel said that at the time of the post-conviction hearing, he was unaware of the statutory requirements for empaneling a jury when a venire did not contain sufficient potential jurors and that he could not recall if he knew the statutory procedure at the time of the trial. He could not recall the number of jurors "selected off the street."
>
> . . . .
>
> . . . Relative to the Petitioner's allegation that he was denied his constitutional right to a fair trial based upon the method utilized to empanel the jury, the post-conviction court found that no evidence beyond mere allegation was presented at the evidentiary hearing and that the Petitioner failed to satisfy his burden. . . .
>
> Based upon review of the record, we conclude that the Petitioner's allegations are waived for failure to present them in the direct appeal of his

convictions. See [Tenn. Code Ann.] § 40-30-106(g) (2012). The Post-Conviction Procedure Act states that "[a] ground for relief is waived if the petitioner personally or through an attorney failed to present it for determination in any proceedings before a court of competent jurisdiction in which the ground could have been presented[.]" Id. Because the Petitioner did not present his allegations regarding violations of his constitutional rights to a fair trial and impartial jury in the appeal of his convictions, they are waived for purposes of post-conviction relief.

Id. at *7, 21-22.

On March 7, 2017, almost twelve years after he was convicted, the Petitioner filed a petition for a writ of error coram nobis, claiming that he was entitled to a new trial because the trial court "ran out of potential jurors" while empaneling the jury for his trial and had the sheriff "bring individuals off the street to act as jurors." The Petitioner further claimed for the first time that one of the officers sent to obtain the additional jurors was Detective Price, who had investigated his case and had testified at trial.

The Petitioner asserted in the petition for a writ of error coram nobis that on November 18, 2016, he was discussing his case with his then-wife, Ammie Barker Stewart, and that she "told him the story of Detective Price's actions during the day of selecting the jury." Specifically, Ms. Stewart told the Petitioner that Detective Price made statements to potential jurors about the Petitioner's guilt. The Petitioner contended that the sheriff's sending out State witnesses to "'round up'" potential jurors violated his constitutional right to a fair trial and that Detective Price's statements tainted the jury pool. The Petitioner claimed, "If these jurors had not been empaneled, the verdict could very well have been different." He also claimed that he was without fault in failing to present the evidence within one year of his judgments of conviction becoming final because he did not know about Detective Price's statements inside the bank until he discussed his case with Ms. Stewart.

In support of his petition, the Petitioner attached a signed statement from Ms. Stewart, which was dated January 27, 2017. The statement provided as follows:

> On November 15, 2005 I was a teller at First Bank of Tennessee in Benton Tennessee. At that time my name was Ammie Barks. It was around lunch time this day that detective Joe Price with the Polk County Sheriff Department entered through the front door of the bank and shouted from the front door as he walked toward the teller line asking who wanted to go sit on the jury of a murder trial. He continued to walk up to my teller window and stand in front of me. Another teller was present at the time in the teller

window to my right. I ask[ed] Mr. Price if he was serious about wanting someone to go sit on the jury. He said yes it would not take long, it was an open and shut case the defendant was guilty. At that time I told him I didn't think our bank manager, Faye McClary, would let any of us leave. He then walked into her office to speak with her about this matter. He returned to my teller window saying Mrs. McClary had given her permission for us to leave if we chose to. I told Mr. Price that I did not wish to be on the jury as did the other teller present. I then found out it was the trial of [the Petitioner] I was asked to be on. I felt at the time an investigating officer of the case should not be allowed to pick jurors off the street and that he would not receive a fair trial that way. This incident stood out to me because I had a previous history with [the Petitioner] and knew him well.

The coram nobis court appointed counsel to address the timeliness of the petition. In an amended petition for a writ of error coram nobis, the Petitioner stated that he did not discover the facts underlying his claim until November 18, 2016. The Petitioner argued that equity supported tolling the statute of limitations because his fundamental right to liberty was infringed after his guilt was determined by "[b]iased jurors selected from a tainted jury pool." The Petitioner again attached Ms. Stewart's sworn statement to his amended petition.

During opening statements at the coram nobis hearing, the State argued that the "writ is woefully deficient on its face for several reasons." First, the State argued that the petition for a writ of error coram nobis had been brought well-beyond the statute of limitations. Second, the State argued that Ms. Stewart was not credible because she knew the Petitioner "well before the events occurred" and then married him. Coram nobis counsel objected to the "mention of the marriage" because "[i]t's not probative or relevant." The coram nobis court overruled the objection and allowed the State to continue, saying, "[I]t's opening statement." Third, the State argued that the Petitioner had no proof of the effect, if any, Detective Price's alleged statements had on the actual jury panel. The State argued that the coram nobis court should dismiss the petition without a hearing.

The coram nobis court acknowledged that whether the actual jury panel was affected was a valid concern but denied the State's motion to dismiss the petition summarily. The court thought the Petitioner had raised a colorable claim that warranted a hearing, at least to determine when the Petitioner learned about the evidence and whether due process required tolling the statute of limitations.

Ammie Stewart testified for the Petitioner that at the time of his trial, she was working at Peoples Bank in Benton. One day, Detective Price came into the bank and asked if anyone wanted to be on the jury for a murder trial. Ms. Stewart and another teller

- 4 -

told Detective Price that they did not know if they could leave the bank. Detective Price talked with Faye McClary, the bank vice president, and McClary gave Detective Price permission for the tellers to leave. Detective Price then spoke with the tellers. Ms. Stewart stated, "He said it won't take very long if you want -- if y'all want to go. He said it's pretty cut and dry. He's guilty." Ms. Stewart was certain Detective Price was the person who came into the bank and estimated that he was in the bank for ten or fifteen minutes. She said Detective Price must have been referring to the Petitioner's trial because "that was the only trial in Polk County at that time." Ms. Stewart said that at the time of the incident, she knew the Petitioner because they had been "friends."

Ms. Stewart testified that in 2017, she and the Petitioner were talking about his trial. Ms. Stewart told the Petitioner about Detective Price coming into the bank and about what Detective Price had said. She had never mentioned the incident to the Petitioner previously. She explained, "[A]t that time I never knew how any of that stuff worked. So I didn't know if it, you know, played a big part in it. I didn't know if it had anything to do with it." She acknowledged that after she and the Petitioner started talking, she knew "he'd had appeals and post-trial procedure[s]."

At the conclusion of Ms. Stewart's direct examination, the coram nobis court referred to counsel's earlier objection about Ms. Stewart's marriage to the Petitioner and stated that the court thought their relationship "does go to her general character, potentially the intelligence and respectability of the witness, whether or not this witness has an interest in the outcome of the proceedings, their feelings. And it does go to apparent fairness or bias." The coram nobis court then questioned Ms. Stewart about her relationship with the Petitioner. The coram nobis court asked if Ms. Stewart and the Petitioner were married, and she said she married him in November 2015. Their relationship began while the Petitioner was in prison and consisted of letters and prison visits. They divorced in March 2018, about one and one-half years prior to the hearing. Ms. Stewart said she thought she told the Petitioner about Detective Price in 2017. The coram nobis court asked if Ms. Stewart still had "affection" for the Petitioner, and she responded, "No. We're no longer together." The court remarked that affection could continue after divorce and asked again if she had affection for the Petitioner. Ms. Stewart said, "Yeah. I mean, I still care about him, yes." She said, though, that she no longer communicated with him. The coram nobis court asked if Ms. Stewart remembered the other teller's name, and she answered, "It was either Alex Brock or Tabitha Roller (phonetic)."

On cross-examination, the State began asking Ms. Stewart about her dating and marrying the Petitioner while he was in prison. Ms. Stewart acknowledged that she had to undergo counseling from May to November prior to the marriage. At that point, coram nobis counsel objected, arguing that the State's questions were irrelevant. The coram nobis court overruled the objection, stating, "I think it's very relevant. An individual who

chooses to marry someone who is incarcerated for a considerable period of time is not what this court considers to be within the normal frame of human behavior and . . . there is a concern about counseling, potential clearness of mind, one's judgment." Ms. Stewart said that she thought she began visiting the Petitioner in prison in June 2014 and that she had to make a written request to marry him. In her letter requesting permission, she wrote that she and the Petitioner had known each other for approximately twenty-six years, that they had dated for several years when they were young, and that "God brought us back together." The letter stated, "Throughout our separate journeys we have never stopped loving each other and want to spend the rest of our lives together." Ms. Stewart reiterated that neither she nor anyone she worked with went to the Petitioner's trial.

At the conclusion of Ms. Stewart's testimony, coram nobis counsel advised the coram nobis court as follows:

> I started to say in earlier, in an appointed error coram nobis proceeding, the defense counsel does not get an investigator and this case would be very much helped by an investigator because I don't have the resources to drive all over Polk County. I've made every call I can. But I -- there may be people out there that have more information. The testimony is that an officer went and made statements. Maybe no one from that bank showed up on that jury, but maybe some other bystander did.

Coram nobis counsel later stated, "I don't know if I can ask for an investigator unless the Rules say I can, but I -- we -- that's our basis for asking for this." However, counsel did not specifically request an investigator.

The Petitioner testified that in 2014, he was in court on his post-conviction petition, and Ms. Stewart was in court on another matter. Subsequently, Ms. Stewart wrote him a letter, and he responded. Ms. Stewart wrote him a second letter in which she "mentioned something about Joe Price coming into this bank." The Petitioner said that if he had known about Detective Price's statements in the bank while his post-conviction petition was pending, he would have added the issue to his post-conviction petition.

The Petitioner testified that he and Ms. Stewart became "acquainted with one another," which led to marriage. He described her as "a great lady" and said that she had been "dragged into something that she probably wished she wasn't." In November 2016, the Petitioner and Ms. Stewart were discussing his case while she helped him type his federal habeas corpus petition, and she told him about Detective Price's comments in the bank. At that time, though, the Petitioner "didn't understand all the legalities of the comment[s]." The Petitioner said:

In jury selection an investigating officer of my case and a witness for the State they have no right to go out into any community and pick a jury or potentially pick jurors and we'll say potentially because I don't know if he did or didn't. If there were any jurors brought in that he spoke to, I'll never know that. Why? Because all 14 of the jurors are not standing here this morning. There not none of them here. Okay? Could the potential that he picked some jurors, could it have arose? Yes, it could have. Could the potential that he didn't? Yes, it could have. We'll never know that. Okay? That's something that will never be known to this Court.

The Petitioner stated, "I'm here on the process alone. I'm not here because jurors have been seated. . . . I'm here over the process of how they got seated."

On cross-examination, the Petitioner testified that he and Ms. Stewart began dating when they were eleven years old. At some point, the Petitioner's family moved to Meigs County, and he and Ms. Stewart "had no more relations." Ms. Stewart visited the Petitioner in the hospital in 1996, and he did not see her again until 2014.

On redirect examination, the Petitioner testified that he received Ms. Stewart's second letter, in which she mentioned that Detective Price came into the bank, on April 7 or 8, 2014. He stated that he still had the letter and that the letter "just said that [on] the day of [his] trial that [Detective Price] had walked into the bank and asked if anyone wanted to sit on the jury." The Petitioner did not follow up on the letter because he "didn't see anything behind it." The Petitioner did not learn about Detective Price's statements about the Petitioner's guilt until 2016.

Joe Price testified for the Petitioner that he worked with the Polk County Sheriff's Office from 1992 until he retired on January 1, 2019. Detective Price testified at the Petitioner's trial in November 2005. He said that he participated in finding jurors on the day of the trial but that his recollection of the event was "not necessarily bright and shiny." Detective Price explained that there were not enough jurors in the jury pool and that the sheriff had him procure more jurors. Detective Price said that he was "sure" he helped find more jurors and that he thought he went to businesses, such as banks, that were close to the courthouse to find jurors.

Detective Price testified that obtaining jurors from local businesses was "not necessarily standard practice" but that he had done it approximately three times. He explained that he entered each business and asked if anyone was willing to serve on a jury. Detective Price said he had been "very cognizant" that he would be called as a witness at the Petitioner's trial; therefore, he "would have been . . . cognizant of [his] words" and

"would not have . . . tainted the jury pool as far as [his] comments or considerations or -- or when [he] asked people to be a part of the jury."

On April 18, 2019, the coram nobis court filed a written order denying the petition for a writ of error coram nobis. At the outset of the order, the coram nobis court found that Ms. Stewart was not a credible witness. The court noted that Ms. Stewart and the Petitioner grew up together, that she became romantically interested in him when she saw him in court on a post-conviction matter in 2014, and that she married him in November 2015. The court then stated as follows:

> While it has been spoken that it is a fool that looks for logic inside the chambers of the human heart, this Court cannot begin to understand what could possess a free citizen to begin a romantic pursuit of a convicted murderer serving a life sentence. Contrary to the assertions of Petitioner's counsel at the hearing of this claim, such information is highly relevant and probative of the credibility of Ms. Ammie Stewart. The lifestyle choices of Ms. Stewart cripple her intelligence and respectability as a witness. Despite her divorce from Petitioner in March of 2018. Ms. Stewart continues to hold strong feelings for the Petitioner. She is biased in Petitioner's favor. She did not present as a reasonable or fair witness. She continues to hold a strong interest to testify in a manner to bolster Petitioner's claims. Ms. Stewart did not exhibit a quality appearance and demeanor at the hearing consistent with fairness and truth.

The coram nobis court noted that the Petitioner testified that Ms. Stewart told him about Detective Price's comments in 2016 while they were drafting other legal documents. The court accredited Detective Price's testimony that he helped obtain jurors for the Petitioner's trial and Detective Price's testimony that he never "made any improper statements to jurors during the gathering process." The coram nobis court found that the petition for a writ of error coram nobis presented "a cognizable claim" in that "[t]he proper procedure for empaneling jurors and obtaining additional petit jurors pursuant to Tenn. Code Ann. § 22-2-310 was not followed in this case at the Petitioner's trial." However, the coram nobis court found that even if it were to take Ms. Stewart's testimony as true, the Petitioner was not entitled to relief because there was no allegation that any employees from Peoples Bank or that anyone who heard Detective Price's statements came to court and served on the Petitioner's jury. The court further explained:

> [T]here is no evidence that [Detective] Price, or any other prosecution witness, actually procured the extra jurors, which were included in the petit jury to decide [the] Petitioner's trial. More substantially, there is no evidence that any improper statements were ever made to these jurors plucked from

- 8 -

the streets of Benton who became part of the [jury] in an effort to taint or sway the opinions of those new jurors.

Accordingly, the coram nobis court denied the petition for a writ of error coram nobis.

## II. Analysis

### A. Funds for an Investigator

First, the Petitioner claims that our supreme court's rules "arbitrarily and prejudicially" prevented him from receiving a fair coram nobis hearing because he was unable to hire an investigator to find additional witnesses in support of his petition. The Petitioner contends that using an investigator to "track down" witnesses was particularly important in his case because the coram nobis court found Ms. Stewart not credible. The State argues that the Petitioner was not entitled to an investigator. We agree with the State.

The Petitioner contends that his previous attorney requested an investigator but that the coram nobis court denied the request. The Petitioner also contends that his "present counsel searched for the motion in the Polk County Clerk of Court's office, but could not find the filing. Counsel intends to supplement the record with evidence of the denial." However, the appellate record is devoid of any supplemental materials reflecting that the Petitioner requested funds for an investigator. See Tenn. R. App. P. 36(a); see also Tenn. R. App. P. 24(b).

In any event, an indigent petitioner is not entitled to state funds for an investigator in a petition for writ of error coram nobis. According to our Tennessee Supreme Court Rules,

> [i]n the <u>trial and direct appeal</u> of all criminal cases in which the defendant is entitled to appointed counsel and in the trial and appeals of post-conviction proceedings in capital cases involving indigent petitioners, the court, in an <u>ex parte</u> hearing, may in its discretion determine that investigative or expert services or other similar services are necessary to ensure that the constitutional rights of the defendant are properly protected.

Tenn. Sup. Ct. R. 13 § 5(a)(1) (emphasis added); see Tenn. Sup. Ct. R. 13 § 5(a)(2) (providing that "[i]n non-capital post-conviction proceedings, funding for investigative, expert, or other similar services shall not be authorized or approved"). Moreover, in <u>Davis v. State</u>, 912 S.W.2d 689, 696 (Tenn. 1995), our supreme court explained that "[a] person's right to counsel ends at the conclusion of the first stage of direct appeal" and that "[i]n the

absence of a Constitutional right to counsel, there can be no Constitutional right to support services at state expense."

The Petitioner contends that without an investigator, he was unable to "fully develop a record." However, this court is bound by the decisions of the Tennessee Supreme Court. Wesley Jones v. State, No. W2015-01481-CCA-R3-PC, 2016 WL 4357422, at *22 (Tenn. Crim. App. at Jackson, Aug. 11, 2016). Thus, while we can appreciate the Petitioner's argument, we must conclude that he was not entitled to funds for an investigator.

## B. Relationship with Ms. Stewart

Next, the Petitioner claims that the coram nobis court's inquiry into his marriage to Ms. Stewart had "no bearing on the facts of improper jury selection" and that the coram nobis court improperly found "that the act of marriage while one party is in prison is itself a factor for determining credibility." The State argues that it was within the coram nobis court's discretion to decide Ms. Stewart's credibility. We conclude that the Petitioner is not entitled to relief on this issue.

During the evidentiary hearing, coram nobis counsel argued that Ms. Stewart's marriage to the Petitioner was irrelevant to his coram nobis claim. Tennessee Rule of Evidence 401 provides that "'[r]elevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Additionally, "[a]ll relevant evidence is admissible except as [otherwise] provided . . . . Evidence which is not relevant is not admissible." Tenn. R. Evid. 402. However, even relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Tenn. R. Evid. 403. It is within the trial court's discretion to determine whether the proffered evidence is relevant; thus, we will not overturn the trial court's decision absent an abuse of discretion. State v. Forbes, 918 S.W.2d 431, 449 (Tenn. Crim. App. 1995).

Tennessee Rule of Evidence 616 provides that "[a] party may offer evidence by cross-examination, extrinsic evidence, or both, that a witness is biased in favor of or prejudiced against a party or another witness." Further, "[a] witness may be cross-examined on any matter relevant to any issue in the case, including credibility." Tenn. R. Evid. 611(b). This court has held that "[a]ny 'feelings that a witness has with regard to a party or issue is an important factor for the trier of fact to consider in assessing the weight to be given to the witness' testimony.'" State v. Gilley, 297 S.W.3d 739, 765 (Tenn. Crim. App. 2008) (quoting State v. Williams, 827 S.W.2d 804, 808 (Tenn. Crim. App. 1991)). Thus, the existence of a witness's prior relationship with a defendant is relevant to show

bias or prejudice toward the defendant and does impact credibility. See State v. Jeremy Sims, No. W2013-01253-CCA-R3-CD, 2015 WL 5683755, at *11 (Tenn. Crim. App. at Jackson, Sept. 25, 2015).

Turning to the instant case, the coram nobis court found that Ms. Stewart was biased in favor of the Petitioner because she continued to have "strong feelings" for him after their divorce. We agree with the coram nobis court that Ms. Stewart's feelings for the Petitioner were relevant to show bias. However, the coram nobis court's harsh comments about Ms. Stewart, both at the coram nobis hearing and in its order denying relief, demonstrate that the court's primary reason for finding her not credible was her decision to marry the Petitioner.[1] Pursuant to certain restrictions, though, prison inmates have a constitutional right to marry. See Turner v. Safley, 482 U.S. 78, 95-96 (1987). Therefore, in our view, the fact that a person has decided to enter into a legal marriage with a prisoner, even one serving a life sentence for first degree murder, is not, per se, a reason for finding that person not credible. In any event, as we will explain below, Detective Price's statements inside the bank were irrelevant to the Petitioner's coram nobis claim.

## C. Error Coram Nobis

Finally, the Petitioner contends that the trial court erred by denying his petition for a writ of error coram nobis and that he is entitled to coram nobis relief because Detective Price, "an interested official" in his case, "had a hand in rounding up bystander jurors against the statutes providing the jury selection process." The Petitioner urges this court to address the constitutionality of his jury selection process "head on" and to address whether his claims of a tainted jury pool warrant a new trial. The State argues that the Petitioner's petition for a writ of error coram nobis is barred by the one-year statute of limitations; that the Petitioner is not entitled to a tolling of the statute of limitations; and that even if the Petitioner's jury were improperly empaneled, his claim is not cognizable in the context of a petition for a writ of error coram nobis. We are compelled to agree with the State.

The writ of error coram nobis is codified in Tennessee Code Annotated section 40-26-105 and provides as follows:

> (a) There is hereby made available to convicted defendants in criminal cases a proceeding in the nature of a writ of error coram nobis, to be

---

[1] The coram nobis court's statement that "[t]he lifestyle choices of Ms. Stewart cripple her intelligence and respectability as a witness" was extremely disrespectful. We are also perplexed by the coram nobis court's finding that Ms. Stewart "did not exhibit a quality appearance . . . consistent with fairness and truth." The court did not explain what aspects of Ms. Stewart's appearance rendered her not credible.

governed by the same rules and procedure applicable to the writ of error coram nobis in civil cases, except insofar as inconsistent herewith.

(b) The relief obtainable by this proceeding shall be confined to errors dehors the record and to matters that were not or could not have been litigated on the trial of the case, on a motion for a new trial, on appeal in the nature of a writ of error, on writ of error, or in a habeas corpus proceeding. Upon a showing by the defendant that the defendant was without fault in failing to present certain evidence at the proper time, a writ of error coram nobis will lie for subsequently or newly discovered evidence relating to matters which were litigated at the trial if the judge determines that such evidence may have resulted in a different judgment, had it been presented at the trial.

Generally, a decision whether to grant a writ of error coram nobis rests within the sound discretion of the trial court. See State v. Hart, 911 S.W.2d 371, 375 (Tenn. Crim. App. 1995).

The writ of error coram nobis is a post-conviction mechanism that has a long history in the common law and the State of Tennessee. See, e.g., State v. Vasques, 221 S.W.3d 514, 524-26 (Tenn. 2007). The writ "is an extraordinary procedural remedy . . . [that] fills only a slight gap into which few cases fall." State v. Mixon, 983 S.W.2d 661, 672 (Tenn. 1999).

Our supreme court has outlined the procedure that a court considering a petition for a writ of error coram nobis is to follow:

[T]he trial judge must first consider the newly discovered evidence and be "reasonably well satisfied" with its veracity. If the defendant is "without fault" in the sense that the exercise of reasonable diligence would not have led to a timely discovery of the new information, the trial judge must then consider both the evidence at trial and that offered at the coram nobis proceeding in order to determine whether the new evidence may have led to a different result.

Vasques, 221 S.W.3d at 527. In determining whether the new information may have led to a different result, the question before the court is "'whether a reasonable basis exists for concluding that had the evidence been presented at trial, the result of the proceeding might have been different.'" Id. (quoting State v. Roberto Vasques, No. M2004-00166-CCA-R3-CD, 2005 WL 2477530, at *13 (Tenn. Crim. App. at Nashville, Oct. 7, 2005)).

- 12 -

Regarding the timeliness of the Petitioner's petition, a writ of error coram nobis must be filed within one year after the judgment becomes final in the trial court. Tenn. Code Ann. § 27-7-103. "The statute of limitations is computed from the date the judgment of the trial court becomes final, either thirty days after its entry in the trial court if no post-trial motions are filed or upon entry of an order disposing of a timely filed, post-trial motion." State v. Harris, 301 S.W.3d 141, 145 (Tenn. 2010). The Petitioner's judgments of conviction were filed in 2005. The petition for a writ of error coram nobis was filed in 2017, which was well-beyond the one-year statute of limitations.

Nevertheless, the one-year statute of limitations may be tolled on due process grounds if a petition seeks relief based upon newly discovered evidence of actual innocence. Wilson v. State, 367 S.W.3d 229, 234 (Tenn. 2012). Our supreme court has stated that "[i]n determining whether tolling of the statute is proper, the court is required to balance the petitioner's interest in having a hearing with the interest of the State in preventing a claim that is stale and groundless." Id. In general, "'before a state may terminate a claim for failure to comply with . . . statutes of limitations, due process requires that potential litigants be provided an opportunity for the presentation of claims at a meaningful time and in a meaningful manner.'" Id. (quoting Burford v. State, 845 S.W.2d 204, 208 (Tenn. 1992)). Our supreme court has described the three steps of the "Burford rule" as follows:

> "(1) determine when the limitations period would normally have begun to run; (2) determine whether the grounds for relief actually arose after the limitations period would normally have commenced; and (3) if the grounds are 'later-arising,' determine if, under the facts of the case, a strict application of the limitations period would effectively deny the petitioner a reasonable opportunity to present the claim."

Id. (quoting Sands v. State, 903 S.W.2d 297, 301 (Tenn. 1995)). "Whether due process considerations require tolling of a statute of limitations is a mixed question of law and fact, which we review de novo with no presumption of correctness." Harris, 301 S.W.3d at 145.

Initially, we note that the coram nobis court did not address whether the statute of limitations should be tolled in this case. The Petitioner is not claiming actual innocence. In fact, he stated at the coram nobis hearing that he only wanted to challenge the process of obtaining the jurors for his trial. Moreover, the Petitioner was aware at the time of trial that police officers brought people into the courtroom from the street to serve as potential jurors. Michael E. Stewart, No. E2015-00418-CCA-R3-PC, 2016 WL 3621440, at *7. In April 2014, eight months prior to his post-conviction evidentiary hearing, he learned that one of those officers was Detective Price. Therefore, the Petitioner could have raised the issue on post-conviction, and the process used to obtain the jurors for the Petitioner's trial

- 13 -

was not "newly discovered" for the purposes of tolling the statute of limitations. See Tenn. Sup. Ct. R. 28, § 8(D)(4), (5) (providing that the post-conviction evidentiary hearing "shall be limited to issues raised in the petition" but that "the court may allow amendments and shall do so freely when the presentation of the merits of the cause will otherwise be subserved"). Accordingly, we conclude that the statute of limitations should not be tolled in this case.

We note that at the time of the Petitioner's trial, our Code allowed a trial court to obtain additional jurors by using the "bystander jury" selection process. See Tenn. Code Ann. § 22-2-308(a)(2) (2005) (providing that "the judge may, if the judge thinks proper, direct the sheriff to summon a sufficient number [of potential jurors] to complete the jur[y]." However, bystander jurors could not be "summoned by an officer with certain kinds of interest in the case." Gary William Holt v. State, No. 03C01-9808-CR-00279, 2000 WL 66088, at *5 (Tenn. Crim. App. at Knoxville, Jan. 27, 2000). For example, in Oliphant v. State, 282 S.W. 206, 209 (Tenn. 1926), our supreme court held that the defendant's right to a jury trial was violated when the sheriff and the officers who summoned jurors had a financial interest in the outcome of the trial.

In Coury v. Livesay, 868 F.2d 842, 844 (6th Cir. 1989), the Sixth Circuit addressed the constitutionality of Tennessee's bystander jury statute and determined that, under the facts of that case, the process used to select prospective jurors was not unconstitutional because neither the investigating sheriff in the case nor his investigating officers participated in obtaining the bystander jurors. The court noted, though, that "'[i]t is the participation of an interested official in the juror selection process that is fundamentally unfair'" and concluded that an investigating officer should not be allowed to select prospective jurors. Coury, 868 F.2d at 844, 845 (quoting Anderson v. Frey, 715 F.2d 1304, 1309 (8th Cir. 1983)). However, analysis of the issue must be conducted on a case-by-case basis "to determine the extent of any actual prejudice caused by the manner in which additional jurors were obtained." Id. at 845; see James B. Proctor v. State, No. 01C01-9011-CC-00307, 1991 WL 136342, at *2 n.2 (Tenn. Crim. App.at Nashville, July 26, 1991) (citing Coury, 868 F.2d at 845).

Given that Detective Price was an investigating officer in this case and a witness at trial, we agree with the Petitioner that Detective Price should not have participated in the bystander jury selection process and that his doing so may have violated the Petitioner's due process rights. Regardless, an error coram nobis proceeding is not the proper procedural mechanism to remedy violations of constitutional rights; such claims must be raised in post-conviction proceedings. Nunley v. State, 552 S.W.3d 800, 829 n.22 (Tenn. 2018). As stated above, the Petitioner could have raised Detective Price's participation in the jury selection process on post-conviction. Furthermore, evidence that Detective Price solicited bystander jurors "does not qualify as substantive admissible evidence that 'may

- 14 -

have resulted in a different judgment, had it been presented at the trial.'" <u>Id.</u> at 831 (quoting Tenn. Code Ann. § 40-26-105(b)).  Accordingly, we must conclude that the coram nobis court properly denied the petition for a writ of error coram nobis.

### III.  Conclusion

Based upon the record and the parties' briefs, we affirm the judgment of the coram nobis court.

_____
NORMA MCGEE OGLE, JUDGE